In the Matter of DELAWARE COUNTY ELECTRIC COOPERATIVE, INC., Respondent, against CITY OF NEW YORK et al., Appellants, and FREDERICK W. LOOMIS et al., as Commissioners of Appraisal, Respondents.

Third Department, June 29, 1951.

*John P. McGrath, Corporation Counsel of the City of New York* (*Robert E. Hugh* and *Francis T. Murray*, of counsel), for appellants.

*Rudd, Penberthy & Nelson* (*Francisco Penberthy* and *Milton D. Nelson* of counsel), for respondent.

HEFFERNAN, J. This is an appeal from an order under article 78 of the Civil Practice Act in the nature of mandamus which adjudicated that the release provisions contained in a lease to petitioner of certain property of the City of New York applied only to claims against the city in respect to petitioner's electric light and power lines on the leased property and directed the City of New York, its board of water supply and corporation counsel to take the necessary and proper steps to have petitioner's claim in respect to its lines on other lands acquired by the city of Pepacton Dam and Reservoir brought on for hearing and determination before commissioners of appraisal who are ordered to hear, consider and determine the same.

The petitioner, Delaware County Electric Cooperative, Inc., is a New York corporation formed under the Rural Electric Cooperative Law. It was incorporated on July 18, 1941, for the purpose of bringing electric service to rural areas in Delaware, Schoharie and surrounding counties not receiving central station electric service. The system, consisting of about 400 miles of electric transmission and distribution lines, has been constructed and services approximately 1,100 rural consumers.

The City of New York (hereinafter referred to as the " city ") in 1928, adopted the so-called " Delaware Plan " for obtaining an additional supply of water from the Rondout and Delaware water sheds. This plan was approved and adopted by the board of estimate in 1929. Among other projects the plan contemplated the construction of a dam in the valley of the East Branch of the Delaware River near Downsville and the creation of the Pepacton Reservoir covering substantially the river valley between Downsville and Margaretville, a distance of approximately twenty miles. Preliminary work and survey in connection with the proposed Pepacton Dam on the East Delaware had commenced when the board of water supply established an office at Downsville in March, 1940, and continued during the war years. Completion of Pepacton Dam and Reservoir will cover substantially the entire East Branch valley between Downsville and Margaretville with water. The entire reservoir area is comprised in the towns of Colchester, Andes and Middletown.

In October, 1942, the city purchased from the Delaware and Northern Railway Company the lands constituting the railway's right of way in the East Branch valley, the same being a portion of lands required for Pepacton Dam and Reservoir. This right of way, according to maps filed by the city, was subject to private crossings, easements and rights of way which enabled abutting property owners to cross and recross for the purpose of egress and ingress to their respective properties. In addition to the private crossing easements there were also public crossing easements for public highways across the abandoned railroad right of way.

On September 1, 1943, when petitioner first sought permission from the city to cross the former railway lands, it knew of the city's plan to build Pepacton Dam and Reservoir; that surveys and other work preliminary to actual construction was in progress; and that an office had been established by the board of water supply at Downsville. At the time when petitioner made its application for permission to cross the right of way its

lines had not been extended into the reservoir area. That work was not done until sometime after September, 1944.

In response to petitioner's request for crossing rights the city forwarded a proposed lease of the eight locations on the city property sought by petitioner. The proposed lease was the same as the lease finally executed except for minor changes made in paragraphs 7 and 10.

The proposed lease which was received by petitioner on December 18, 1944, was submitted by it to the Rural Electrification Administration and to petitioner's attorney "for their consideration." Between the date of such submission and February 6, 1945, the proposed lease was examined by both the legal division of the Rural Electrification Administration and petitioner's attorney and changes were proposed only in respect to the two paragraphs, 7 and 10. In all other respects the proposed lease was stated by petitioner to be "legally satisfactory in its entirety." On June 5, 1945, the city proposed changes in the two paragraphs in question to satisfy petitioner's objections. These changes were submitted by petitioner to the Rural Electrification Administration for approval, and such approval having been obtained, the lease was executed by petitioner and the city on the 13th day of December, 1945. Petitioner's lines, including those on the leased locations, were constructed before the lease was executed.

The lease in question covered eight described locations in the towns of Colchester and Andes for a term of ten years except that the city had the right to cancel the lease on ninety days' notice in writing.

The lease permits the use by the petitioner of eight locations for the purpose of constructing and maintaining electric transmission and distribution lines for a ten-year term unless the city elected to cancel sooner by giving the written notice referred to above. Each location is particularly described as a line, the longest of which is 170 feet, beginning on the northerly side of the abandoned railroad bed and running in a generally southerly direction. The locations are all indicated upon maps prepared by the city and attached to the lease.

After certain recitals the lease contains thirteen paragraphs. The provisions of ten of which may be briefly summarized, as follows: No. 1, restricts the use of the crossing to the petitioner for transmission; No. 2, prevents advertising; No. 3, permits the petitioner to remove branches, etc.; No. 4, requires that it be done in a satisfactory manner; No. 5, requires the petitioner

to avoid pollution of the water supply; No. 6, gives the city a right of entry; No. 7, gives the city the right to work near the poles and even have them removed; No. 8, gives the city a right of cancellation on ninety days' notice; No. 9, requires the petitioner to restore the property at the termination of the lease; and, No. 10, contains the usual indemnity clause.

The two paragraphs in the lease about which this controversy revolves are Nos. 11 and 12 which read, as follows:

" 11. The Tenant hereby remises, releases and forever discharges the City and the Landlord of and from any and all claims and cause or causes of action whatsoever, which it has, or which it or its successors or assigns may hereafter have under the provisions of Title K of said Administrative Code, if, as and when the City shall acquire any additional lands for water supply purposes in said Towns of Colchester, Andes and Middletown, and the Tenant agrees that, notwithstanding any provision of any general, special or local law or any charter and particularly the provisions of said Title K, the City shall not be required to

" (a) Provide a substitute right of way for its electric transmission and distribution lines and appurtenances;

" (b) Relocate said lines and appurtenances;

" (c) Permit the perpetual use of the premises herein demised and said additional lands for said lines and appurtenances;

" (d) Compensate the Tenant for any expense, loss or damages caused by reason of removing and relocating said lines and appurtenances.

" 12. The Tenant covenants, at its own cost and expense, if, as and when the City shall acquire said additional land for water supply purposes in said Towns of Colchester, Andes and Middletown, to remove said electric transmission and distribution lines, and their appurtenances, notwithstanding any provision of any general, special, or local law or any charter and particularly the provisions of said Title K."

The question herein is the construction of this lease. There is no question about its execution. The ultimate facts are not in dispute. The exhibits, including the correspondence between the parties, are not in dispute, with the exception of the allegations devoted to the amount of the petitioner's damages, the material portions of the petition are not controverted and no triable question of fact is raised, so that the provisions of the lease may be construed without the necessity of a trial.

Chapter 929 of the Laws of 1937 provided the city with an Administrative Code, a codification of laws relating to its government. Title K of chapter 41 of the code, as amended, prescribes the procedure to be followed by the city when it desires to develop additional water supplies. It confers rights and imposes duties and empowers the city to condemn land. Pursuant to title K a petition dated November 7, 1947, was presented by the city to the Supreme Court of the sixth judicial district requesting the appointment of commissioners of appraisal in connection with the city's " Delaware Plan ". This petition recited that no substituted location for any of the lines of the petitioner was provided because the lease executed by the city and the petitioner " released the City of New York from any liability or obligation to provide such a substituted location for or to relocate said lines and appurtenances." On December 5, 1947, an order was granted by the Special Term of the Supreme Court appointing three commissioners of appraisal. Proper oaths of office were executed and filed by them. Upon the filing of the oaths the city, pursuant to title K, became seized in fee of all the real estate delineated on the maps referred to in the order. The order, in addition to appointing commissioners of appraisal, contained a statement that the city " is released from any liability or obligation to provide the substituted location for or to relocate any lines and appurtenances " of the petitioner. By this procedure the city acquired real estate north of the abandoned railroad bed upon which approximately twenty-five miles of electric transmission and distribution lines of the petitioner were located and acquired real estate south of the abandoned railroad bed upon which approximately thirty-five miles of lines of petitioner were located and, as incidental to these acquisitions, the right of petitioner to operate and maintain its lines on such lands ceased and terminated.

On July 27, 1949, petitioner filed a claim with the commissioners of appraisal and served copies on the city requesting payment for the value of its transmission and distribution lines acquired by the city in the condemned area; for the value of the petitioner's lines and property located outside of the condemned area which are to be cut off and rendered useless; for severance damages to the remainder of petitioner's system; and for damages for decrease in value of the petitioner's established business. The commissioners of appraisal refused to hear the claim pending the judicial construction of the lease. Petitioner asserted that the release applies only to that portion

of the transmission and distribution lines and appurtenances crossing the abandoned railroad bed in eight places. The city's position is that petitioner has released it from any liability or obligation to provide a substitute location for or to relocate such lines and appurtenances. In other words, the city disclaims liability for any damages whatsoever by reason of the taking of petitioner's property.

Except for the release provisions contained in the lease, under section K41–26.0 of the Administrative Code, it would have been necessary for the city to delineate on the map and describe in the petition filed in Pepacton Highway Section No. 1 proceeding a substituted route for the lines of petitioner sought to be taken or affected, and to obtain approval of the court to which the petition was presented of such substituted route.

Subsequently this proceeding in the nature of mandamus was instituted to compel the appellants to hear and pay petitioner's claim. As a result of such proceeding the relief sought by petitioner was granted. It is from this order that the appellants now appeal.

The learned Justice at Special Term, in his opinion, held that mandamus is the proper remedy in a controversy of this kind (*People ex rel. Burhans* v. *City of New York*, 198 N. Y. 439), and that petitioner is not estopped by the order made in Pepacton Highway Section No. 1 proceeding because the adjudication as to the meaning of the release provision was a nullity and that there was no triable issue of fact. The court then reached the conclusion that the release provisions of the lease should be construed to apply only to the petitioner's lines on and over the demised premises.

We are unable to concur in the conclusion of the Special Term. It seems to us that the intention to release all claims accruing to the petitioner because of the future acquisitions by the city of " additional lands " for water supply purposes is indicated by the express language of the lease. Thus, under paragraph 11 of the lease, petitioner released " any and all claims and cause or causes of action whatsoever, which it has, or which it or its successors or assigns may hereafter have under the provisions of Title K of said Administrative Code, if, as and when the City *shall acquire any additional lands* for water supply purposes in said Towns of Colchester, Andes and Middletown ". (Italics supplied.) This is followed by petitioner's express agreement in the nature of a covenant not to sue, to the effect that notwithstanding the provisions of any law including title K, the

city would not be required to provide a substitute right of way for petitioner's lines, to relocate such lines, to permit the perpetual use of the demised premises and said additional lands for petitioner's lines, or to compensate petitioner for any expense, loss or damage caused by removing and relocating said lines.

In paragraph 12, petitioner covenanted " at its own cost and expense, if, as and when the City *shall acquire said additional* land for water supply purposes in said Towns of Colchester, Andes and Middletown ", to remove its lines and appurtenances. (Italics supplied.)

The language " if, as and when the City shall acquire any additional lands   *   *   *   in said Towns of Colchester, Andes and Middletown," used in both paragraphs 11 and 12 clearly indicates that the intention was to release in respect to claims by petitioner for future acquisitions of lands not owned by the city at the time the lease was made. That language also clearly indicates that the intention was to release claims in respect to lands beyond the area of the towns of Colchester and Andes which included all of the leased locations, for the town of Middletown is expressly mentioned. The three towns together include the entire reservoir area. Not one of the leased locations is in the town of Middletown.

It is also clear that there would be no future acquisitions by the city of the leased locations for the reason that all parties knew that the leased locations were portions of the former Delaware railway lands which were acquired by the city before the lease was made and before petitioner made its first request for crossings.

Both paragraphs 11 and 12 expressly refer to claims under title K of the Administrative Code of the City of New York, and paragraph 11 goes on and in subdivisions (a), (b), (c) and (d) enumerates particular types of claims. The types of claims thus enumerated are such as arise under section K41–26.0 of the Administrative Code when, and only when, lands used for railroad, highway or other public purposes including electric lines, are acquired by the city for water supply purposes.

Accordingly, except for the release provisions in respect to lands acquired by the city after the making of the lease in the three towns comprising the reservoir area upon which petitioner had located power distribution lines, the city would be required (1) to permit petitioner the perpetual use of the lands acquired for its lines, or to provide a substitute right of way over other lands provided by the city and to relocate petitioner's main or

feeder line thereon; and (2) to pay the reconstruction cost less depreciation of petitioner's branch lines within the taking area and the construction cost of house services, less depreciation plus the cost of removal less salvage value; and (3) to pay any increased cost of maintenance of the substituted line (Administrative Code, § K41-26.0; *Matter of Gillespie [Central Hudson Gas & Elec. Corp.]*, 263 App. Div. 175, affd. 288 N. Y. 514).

The specific language of subdivisions (a), (b), (c) and (d) of paragraph 11 of the lease released the city from each and every one of those obligations of title K, which might arise " if, as and when the City shall acquire any additional lands * * * in said Towns of Colchester, Andes and Middletown," in respect to all of petitioner's lines upon said " additional lands ".

The conclusion of the Special Term that the release provisions of paragraphs 11 and 12 apply only to claims in respect to petitioner's lines on the leased locations cannot be sustained. There was no necessity for such provisions as respects the lines on the leased locations because no claim against the city under title K or otherwise could arise in respect to them even in the absence of a release.

Under title K (§ K41-26.0) it is only the " persons or corporations owning such real estate or claiming interest therein " that are entitled to be allowed the " perpetual use * * * of the same or of such other real estate to be acquired for the purpose of this article as will afford practicable route or location for such railroad, highway or other public purpose ", and that shall not directly or indirectly be subject to expense, loss or damages by reason of changing such route.

In view of the fact that petitioner's right to maintain its lines on the leased locations was terminable upon ninety days' notice in writing under paragraph 8, in which event petitioner was required to remove its lines and restore the premises to their " present condition " without expense to the city as provided in paragraphs 9 and 10, petitioner would not have an interest in such locations as against the city such as would require the city, even in the absence of the release provisions, to provide for its lines on such locations a substitute right of way, an obligation from which the city is released under subdivision (a) of paragraph 11 of the lease; or to relocate petitioner's lines on such locations, an obligation from which the city is released under subdivision (b) of paragraph 11 of the lease; or to permit the perpetual use of the eight locations for such lines, an obligation from which the city is released under subdivision (c) of

paragraph 11; or to compensate petitioner for any loss, damage or expense caused by removing and relocating said lines, an obligation from which the city is released under subdivision (d) of paragraph 11 of the lease.

Under the construction adopted by the court below, subdivisions (a), (b), (c) and (d) of paragraph 11 would have no operation or effect whatsoever. In like manner, since under paragraphs 8, 9 and 10 of the lease petitioner was obliged to remove its lines from the leased locations and to restore the locations to their " present condition " without cost to the city, it follows that under the construction of the paragraph below, paragraph 12 of the lease would have no operation or effect whatsoever. In addition to the fact that no claim under title K could arise with respect to the leased locations, the express language of the lease itself makes it clear that the release provisions were not intended to be confined to the leased locations and to so construe them would do violence to the terms of that document.

The language of the lease clearly indicates that it was the intention to release the city from any claims arising with respect to petitioner's lines upon " additional lands " in the towns of Colchester, Andes and Middletown, if and when such lands were acquired by the city for Pepacton Dam and Reservoir. Clearly, it was the intention to release claims that would come into existence except for the release provisions. The lease not only referred to claims under title K but enumerated types of claims arising thereunder in favor of an electrical corporation. Section K41–26.0 of the Administrative Code makes express provisions in respect to the obligations of the city " In case any real estate so acquired, or used for public purposes, is sought to be taken or affected for the purposes of this article ", which language could have no reference to the leased property, which the city already owned and which could not be " taken or affected ". Section K41–13.0 expressly refers to real estate " so acquired, taken or affected ", and to " loss, damage or expense " to electric corporations resulting therefrom. Obviously, no claim for such loss, damage or expense could arise in favor of petitioner as to the leased locations which had been acquired by the city before the lease was made, and in passing, it may be said that petitioner makes no claim with respect thereto. The language of subdivision (c) of paragraph 11 of the lease, clearly differentiates between the leased locations and " additional lands " to be acquired by the city. The language is: " Permit the per-

petual use of the premises herein demised *and said additional lands* for said lines and appurtenances." (Italics supplied.)

The intention of the parties to release all claims in respect to petitioner's lines on lands in the reservoir area " if, as and when " such lands were acquired by the city, being expressed in unambiguous language leaving no fair reason for doubt as to its meaning, there is no room for construction, and the language of the agreement is controlling and must be given effect (*Gans* v. *Aetna Life Ins. Co.*, 214 N. Y. 326; *Foot* v. *Aetna Life Ins. Co.*, 61 N. Y. 571; *Dwight* v. *Germania Life Ins. Co.*, 103 N. Y. 341). Where the language of a contract is clear and unambiguous, its meaning is to be determined by the language alone, and without regard to extraneous facts (17 C. J. S., Contracts, § 321, p. 749; *Nau* v. *Vulcan Rail & Constr. Co.*, 286 N. Y. 188; *St. Regis Paper Co.* v. *Hubbs & Hastings Paper Co.*, 235 N. Y. 30; *De Angelis* v. *White-All Corp.*, 273 App. Div. 873; *Cream of Wheat Co.* v. *Crist Co.*, 222 N. Y. 487).

Petitioner asserts that the interpretation which the city placed upon the lease would lead to harsh, inequitable and unreasonable results. It may be that petitioner, through a misapprehension of the terms of the lease, made an unwise and burdensome bargain. However, equitable considerations do not justify us in ignoring the express terms of the contract. Even though it may be a harsh and unreasonable one, " the folly or wisdom of a contract is not for the court to pass upon; its terms, however onerous they may be, must be enforced if such is the clear meaning of the language used, and the intention of the parties using that language." (17 C. J. S., Contracts, § 319, p. 742, and cases there cited.)

Petitioner earnestly contends that the release provisions should not be enforced because they relate to future claims. There is no doubt that courts have always been reluctant to give effect to releases of future claims. Future claims, however, are discharged by a release when they are expressly embraced therein or fall within the fair import of the terms implied (*Van Rensselaer* v. *Albany & West Shore R. R. Co.*, 62 N. Y. 65). " Anticipatory releases from liability for injuries to the person of the releasor or to his property or business, and releases of rights which have not yet matured, have generally been held to be valid. Instruments of that kind are self-operative, and discharge the future rights or claims when they arise." (45 Am. Jur., Release, § 31, and cases there cited.)

538

We agree with the learned Justice at Special Term that petitioner is not estopped from seeking to enforce its alleged rights because of the provision contained in the order of December 5, 1947, to the effect that the city is released from all liability. Notice of the presentation of that petition upon which the order was based was given by publication and was entitled: "Notice of application for appointment of Commissioners of Appraisal." Petitioner was only bound by that order insofar as it appointed commissioners of appraisal. We agree with the Special Term that the attempted adjudication of the meaning and construction of the release paragraphs of the lease is a nullity.

The order appealed from should be reversed on the law and not in the exercise of discretion, and the petition dismissed, with $50 costs and disbursements, but without prejudice to any other action or proceeding which petitioner may be advised to institute.

Foster, P. J., Brewster and Bergan, JJ., concur; Deyo, J., dissents in the following memorandum: When we consider this lease in its entirety and analyze the disputed paragraphs in conjunction with the preceding portions thereof, the conclusion seems to me to be inescapable that the release applies only to the transmission and distribution lines and appurtenances located on and over the demised premises. The order of the Special Term should be affirmed.

Order appealed from reversed on the law, and not in the exercise of discretion, and the petition dismissed, with $50 costs and disbursements, without prejudice to any other action or proceeding which petitioner may be advised to institute.