In the Matter of the Arbitration between IRVING DIMSON et al., Appellants, and ATAOLLAH ELGHANAYAN, Respondent.

First Department, December 6, 1966.

*Gerald D. Stern* of counsel (*Mordecai Rochlin* and *John J. Knapp* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for appellants.

*Sidney Feldshuh* of counsel (*John F. Loverro* with him on the brief; *Feldshuh & Frank,* attorneys), for respondent.

BREITEL, J. P. Petitioners appeal from an order denying their application to stay an arbitration sought under a set of agreements between two groups of real estate investors providing for a voluntary division of jointly-owned properties. Special Term dismissed the petition on the ground that the agreements provided for arbitration of any disputes and the rejection by respondent of an appraisal made under one of the agreements had given rise to a dispute. The order should be affirmed.

Involved is a dispute arising under a supplementary agreement executed simultaneously with a basic agreement which contained an unqualified broad arbitration clause. Creating an illusory difficulty is the fact that the supplementary agreement provided for an appraisal of value by persons other than the arbitrators and that one side to the appraisal had the power to reject the appraisal. The parties now dispute the scope of the power of rejection. The question before the court is only whether the disputes are resolvable in arbitration.

The dissent examines the basic agreement and the supplementary agreement and finds that the power to reject the appraisal should be limited and appraisals should be excluded from arbitration because "any differing interpretation [of the agreement] would be unreasonable". The point is that the power to interpret the agreements belongs to the arbitrators and not to the court, even if to the court there appears to be no practical or even any rational basis for the view of the one seeking arbitration (CPLR 7501; 8 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 7501.20; *Matter of Exercycle Corp.* [*Maratta*], 9 N Y 2d 329, 334; *Matter of Uddo* [*Taormina*], 21 A D 2d 402, 405). Actually, there may be a quite practical basis for the outside appraisal, while still making it subject to arbitration, but it would be improper for the court to explore that issue without indulging improperly in an invasion, if not injecting an undue influence, upon the eventual deliberations of the arbitrators.

The basic agreement between the parties was carefully negotiated by their lawyers over an extended period of time. Before the closing, however, a number of other matters were considered or reconsidered. Instead of revising the basic agreement, the new matters were covered in a number of supplementary agreements. All were executed at the same time and are, of course, to be considered together (*Nau* v. *Vulcan Rail & Construction Co.,* 286 N. Y. 188, 197; Restatement, Contracts, § 235, subd. [c];

*Matter of Stone* [*Freezer*], 280 App. Div. 103, affd. 304 N. Y. 649, involving an arbitration clause in a principal agreement and a dispute under an additional amending agreement executed simultaneously). Moreover, the language of the supplementary agreement which gave rise to the present dispute makes it clear that it is a part of and is to be read together with the master agreement: "Supplementing and, to the extent required, modifying said Section 6 of the Basic Agreement, we hereby agree". Hence, the court is unanimous that disputes under the supplementary agreement are embraced within the arbitration clause of the basic agreement.

Under the basic agreement, each of the two groups of investors had the option to dissolve the several ventures. In the event of such option, the Elghanayan group had the right to set the values of the properties involved in pairs, and the other group, petitioners in this proceeding, had the option to select in each instance which member of the pair to take. Money adjustments would be made for the differences in value. The supplementary agreement in suit implemented this formula by providing for an independent appraisal by real estate experts selected by agreement from a list of five included in the supplementary agreement. These refinements were necessary because the shares of the two groups in the pairs of properties were not equal, and any inflation of values by the value-fixer would require an adverse financial adjustment from the group electing to take the property.

The supplementary agreement, however, provided further that the Elghanayans were not bound by the appraisal but were free to give their own opinions of value as provided in the basic agreement and "shall be free to adopt or reject the values, or either of them, reported by the appraiser".

With respect to the paired 46th Street and 57th Street properties (the two in this case), the Elghanayans did what had been anticipated might occur. They rejected the appraisals and set their own values. The Elghanayans contend that they have the right to reject the appraisals for all purposes, while the petitioners contend that the appraisals are binding to the extent of determining the financial overages or adjustments that must be paid in pairing the properties and dividing them between owners of unequal shares. The Elghanayans have demanded arbitration of the appraisals. The issue before the court is who is to decide this dispute: the court or the arbitrators.

The issue should be determined by looking to the arbitration clause. It reads:

" 10. *Arbitration; Specific Performance.*

" The parties agree that they would be irreparably damaged if this Agreement were not subject to specific performance. Any dispute or controversy arising out of this Agreement or relating to any term or provision hereof shall be submitted to arbitration in the City of New York in accordance with the rules then obtaining of the American Arbitration Association. The arbitrators shall have the power to compel specific performance of any term or provision of this Agreement including, without limitation, the provision requiring the Elghanayans to give the notice of values referred to in Section 6B(1) hereof. In such event the arbitrators shall have power to determine the values of the properties referred to in Section 6B(1) and the BDF Group shall have the right to specify the enterprise or enterprises of which the BDF Partners elect to become the sole owners. Judgment upon any award of the arbitrators may be entered in any court having jurisdiction."

The expectation that the arbitrators would determine values should be particularly noted. The clause, beyond that, is broad and without qualification.

The next applicable provision is that for appraisal in the supplementary agreement. In its entirety it reads:

" (1) Not later than March 1, 1966, one of the following:

> Cruikshank Company
> Horace S. Ely & Co.
> Brown, Harris, Stevens, Inc.
> William A. White & Sons
> Albert B. Ashforth, Inc.

shall be selected, by agreement between the BDF Group and the Elghanayans, to appraise, on a free and clear basis, the land, improvements, and personal property, other than supplies, located on and used in connection with the premises of each of 46th Street and 57th Street. If the BDF Group and the Elghanayans are unable to agree on such appraiser by March 1, 1966, such selection shall be made from among the firms named above by the President of the Real Estate Board of New York. The appraiser so selected shall render a report of his appraisal of each of said premises as aforesaid to the BDF Group and to the Elghanayans not earlier than April 1, 1966, nor later than May 1, 1966. The cost of such appraisals shall be paid, in equal shares, by 46th Street and 57th Street.

" (2) The Elghanayans thereupon may, but shall not be required to, give notice to the BDF Group not later than July 1,

1966, of their opinion of the values of each of 46th Street and 57th Street, as provided in Section 6A(1) of the Basic Agreement. In giving such notice, the Elghanayans shall be free to adopt or reject the values, or either of them, reported by the appraiser pursuant to paragraph (1) hereof.''

Again, there is a lack of qualification or limitation upon the right of rejection. Nor is any exception expressed with respect to the arbitration clause. And, of particular importance, there is no finality expressed with respect to the appraisal itself. The issue then becomes one of interpretation of the agreements. Moreover, the issue relates to substantive provisions of the agreements and not to the arbitration clause.

CPLR 7501 provides: '' In determining any matter arising under this [arbitration] article, the court shall not consider whether the claim with respect to which arbitration is sought is tenable, or otherwise pass upon the merits of the dispute.'' It was by this statute and its predecessor that the '' bona fide dispute '' rule was finally eliminated. As this court said quite recently of this statute: '' It would follow that a mere claim, no matter how frivolous, is sufficient to invoke the process [of arbitration] '' (*Matter of Uddo* [*Taormina*], 21 A D 2d 402, 405, *supra*).

Thus it is not appropriate for the court to discuss what influence or effect the expert appraisal may have or should have on the arbitrators, whether the Elghanayans have suggested plausible defects in the appraisals to establish their good faith in seeking arbitration, or whether appraisals are more like a form of arbitration or not (see 8 Weinstein-Korn-Miller, *op. cit.*, par. 7601.02). Nor is it appropriate, on the other hand, to discuss what practical importance or lack of it any valuation by the Elghanayan group would have if the outside appraisal is conclusive, or what practical value there is in having the properties paired on Elghanayan values but the adjustment determined solely by the appraisal values. None of these matters go to determining who should decide the dispute but only to how the dispute should be decided. No one in this court questions that if there is a dispute it is for the arbitrators to determine; and the law is now clear that, if anyone claims there is a dispute under an applicable arbitration clause, it is not for the court to say that there is none.

Essential to the analysis of the problem in this case is the recognition that the issue or dispute involves the scope and effect of the provisions for outside appraisal and the correlative scope and effect of the provisions for the Elghanayans to reject

any outside appraisals. These are matters governed by the substantive clauses of the agreements. There is no issue with respect to the language, meaning, scope, or effect of the arbitration clause. If there were, that, to be sure, would be a question for the court and not for the arbitrators (cf. *Matter of De Luca [MVAIC]*, 17 N Y 2d 76, 80). That this is not the issue is demonstrated by the absence of any language in any of the arbitration or appraisal clauses which purports to limit the scope of arbitration or purports to except any matter from arbitration. Thus, no party to the litigation or anyone else argues to or from the arbitration language in the agreements.

Lastly, however phrased, to invoke a rule to exclude arbitration of a tendered dispute where reasonable minds might not differ is to attempt to resuscitate the dead and much-criticized rule of the *Cutler-Hammer* case (*Matter of International Assn. of Machinists [Cutler-Hammer Inc.]*, 297 N. Y. 519; 8 Weinstein-Korn-Miller, *op cit.,* par. 7501.20).

Accordingly, the order dismissing the petition should be affirmed, with costs and disbursements to respondent-respondent.

STEUER, J. (dissenting). Two groups of investors owned some eight properties. For the purpose of easy understanding of the complex plan they evolved, one group will be designated as the D group, and the other as the E group. They desired to terminate their relationship, but without resort to an action for partition or public sale. To effectuate their desires they agreed to pair the properties into four couples of two each— pairing the properties bearing the greatest resemblance to each other. Then the E group was to put a value on each property. The D group would then select one property from each pair. If the property so selected had a higher valuation (as designated by the E group), the D group was to pay the difference to the E group; if the property had a lower valuation, it would receive the difference from the E group. This was the basic plan as embodied in the main agreement, and it would have been complete had each group had an equal share in the venture. But they did not. The D group owned 45% and the E group owned 55%. So instead of the actual differences in valuation being the measure of the D group's right or obligation, a sum reflecting the 10% difference in ownership would be required. This caused the following difficulty. If the ownership was equal and if the values fixed by the E group were too low, the D group could protect itself by taking the more expensive properties; and conversely, if they were too high, they could take the lower valued properties. But with the E group getting a 10% increase, that

group, by consistently overvaluing the properties, would obtain an advantage.[1]

To take care of this inequity, a supplemental agreement was entered into. This provided for the selection of an appraiser who would value all the properties. His valuation would, however, only apply to the 10% differential in ownership. The E group in valuing the properties could use his appraisals or disregard them. But in calculating the additional sums to be paid or received, when the 10% differential was calculated, the values fixed by the appraiser were to be used.[2]

The main agreement contains an arbitration clause. We are in agreement that this clause also applies to the supplemental agreement. The arbitration agreement is broad and directs the arbitrators to see that the agreement is specifically performed. In that connection it gives the arbitrators the power to put a value on the properties in the event that the E group fails to do so.

The parties selected an appraiser. He has appraised the properties. The E group is not satisfied with his appraisals and has demanded arbitration. Special Term has directed an arbitration on this score. This conclusion was reached on a misreading of the contract. The contract states that the valuations of the appraiser are not to be binding on the E group, but there was a failure to recognize that this exemption extended only to the fixing of their own values by the E group and does not refer to the values fixed for the purpose of equalizing the disparity in investment.

The majority reaches the conclusion on the ground that whether or not the appraiser's values are conclusive is a matter of interpretation which is arbitrable. It is not disputable that under a broad and general arbitration clause the intent of the parties as disclosed by the agreement is a matter for the arbitrators to interpret. Nor, I take it, is it disputable that whether the parties agreed to arbitrate and what they agreed to arbitrate is a matter for the courts. The semantic maze engendered by these apparently conflicting propositions is not real. When rea-

---

[1] For example, suppose the two properties in a pair were worth, respectively, $1,000,000 and $1,500,000. The D group could take their choice and if they took the former it would cost them $550,000 and if they took the latter they would receive $450,000. But if the same properties were valued at $2,000,000 and $3,000,000, it would cost $1,100,000 or they would receive $900,000. By increasing the valuation, the differential is correspondingly increased.

[2] So, in the suppositious instance used, if the appraiser and the E group fixed the values at $1,000,000 and $1,500,000, there would naturally be the same differentials — $450,000 and $550,000. But if the E group fixed the $2,000,000 and $3,000,000 values, the differentials would be $1,050,000 and $950,000.

sonable minds could not differ as to the expressed intent, the court must determine what was to be submitted to arbitration. Where there is room for reasonable disagreement, the question, like any other arising under the contract, is for the arbitrators.

Applying these elementary principles to the matter in suit, it could not be disputed that if the contract said *in hæc verba* that the valuations of the appraiser were not subject to arbitration and were final and binding, that would not be subject to interpretation by the arbitrators and they would have no power to effect any change. It is submitted that when these contracts are read and understood, this is exactly what was meant, and any differing interpretation would be unreasonable. The contracts cannot be read without concluding that the primary object of the contracting parties was to divide their interests in the properties they owned, and to do this on the basis of a carefully worked out mathematical formula without the intervention of any tribunal. It was only in the event that one party or the other sought to deviate from the formula set out that arbitration could be invoked to compel him to adhere to it. The provision for appraisal was an inherent part of the formula. It cannot be maintained that it was intended that the arbitrators were to sit as a court of review of the appraiser's valuations. By the same meticulous, if somewhat involved, methods that characterize the other procedures called for by the contracts, the appraiser was selected from a list supposed to represent the best qualified individuals in the field. The arbitrators were not chosen on this basis. To find that it was intended that they could annul the appraiser's findings would necessarily require a finding that the appraiser was merely to be advisory to the arbitrators, which, it is submitted, is entirely contrary to the meaning of the agreements.

It is believed that the agreements leave no room for any interpretation that the parties' expressed intent was to subject the appraiser's findings to any review. As the matter sought to be arbitrated is not arbitrable, the motion to stay arbitration should have been granted.

RABIN, STEVENS and CAPOZZOLI, JJ., concur with BREITEL., J. P.; STEUER, J., dissents in opinion.

Order, entered on August 10, 1966, affirmed with $30 costs and disbursements to the respondent.