269 F.2d 427
 122 U.S.P.Q. 422
 WHITFIELD & SHESHUNOFF, INC., Plaintiff-Appellee,
v.
FAIRCHILD ENGINE & AIRPLANE CORPORATION, Defendant-Appellant.
FAIRCHILD ENGINE & AIRPLANE CORPORATION, Plaintiff-Appellant,
v.
WHITFIELD & SHESHUNOFF, INC., and Marshall G. Whitfield,
Defendants-Appellees.
 Nos. 152, 153, Dockets 25120, 25121.
 United States Court of Appeals Second Circuit.
 Argued Dec. 3, 1958.
Decided Aug. 4, 1959.
 
 Milton E. Schattman, New York City, for plaintiff-appellee Whitfield & Sheshunoff, Inc., in first action.
 Gibson Yungblut, Cincinnati, Ohio, for plaintiff-appellee Whitfield & Sheshunoff, Inc. on counterclaim in first action and for defendants-appellees in second action.
 Walter H. Free, New York City (John F. Neary, Jr. and Brumbaugh, Free, Graves & Donohue, New York City, on the brief), for defendant-appellant and plaintiff-appellant, Fairchild Engine & Airplane Corporation.
 Before SWAN, MEDINA and WATERMAN, Circuit Judges.
 MEDINA, Circuit Judge.
 
 
 1
 Fairchild Engine & Airplane Corporation, asserting a large number of miscellaneous alleged prejudicial errors, appeals from a judgment in two consolidated actions that in substance found all the facts as claimed by appellees, granted the relief prayed against Fairchild in the first action, and, except for issues abandoned or withdrawn on consent, rejected all the contentions advanced by Fairchild and dismissed its counterclaim in the first action and its complaint in the second action.
 
 
 2
 Marshall G. Whitfield and Victor Sheshunoff are two metallurgical inventors whose skill and persistent experimentation produced many interesting and valuable inventions that are disclosed in a great variety of patents in evidence in this record. For some years they were associated with Fairchild, whose principal interest in the beginning of the relationship was in finding some means of dissipating or reducing the heat generated in the cylinders of its airplane engines. As the end of World War II approached and the demand for airplane engines began to diminish, a controversy developed between the inventors and Fairchild concerning the proper interpretation of the series of contracts between the parties. There had been reserved to the inventors an irrevocable, exclusive, royalty-free license to manufacture, use and vend 'apparatus, equipment, appliances and chattels of any and all kinds and descriptions, and any parts thereof,' later limited to 'the field of aluminum-coated sheet, strip and wire,' by and in connection with certain processes, apparatus, products and improvements described by the parties as AL-Fin processes. Fairchild claimed the reference to 'apparatus, equipment, appliances and chattels' was restricted to a prior agreement or agreements that had been amended and superseded, and that the inventors were limited to the practice of the patented processes in the manufacture of sheet, strip and wire for commercial sale. The inventors, on the other hand, asserted that their license covered the entire 'field of aluminum-coated sheet, strip and wire,' including any article made of or containing sheet, strip or wire and thereafter coated with aluminum in accordance with the disclosures of the AL-Fin processes. This dispute as to the interpretation of the contracts is the subject matter of the action by the company bearing their name, to which the inventors had assigned their rights pursuant to the terms of the license agreed upon. As Fairchild had gone ahead with 'the pots and pans' and other articles in the disputed area, and brushed aside the protests of the inventors, injunctive relief and an accounting were sought.
 
 
 3
 Fairchild not only denied any violation of the license granted to the inventors and pleaded laches as a defense, but it advanced by counterclaim in the first action and by affirmative allegations in the separate action later brought by Fairchild, and characterized by the trial judge as a 'procedural maneuver,' a series of contentions and issues, including some sought to be introduced by amendment at the trial, so numerous and so complicated as to smack of harassment. The counterclaim alleged that four applications for Letters Patent filed by the inventors in 1949 and 1950, long after the parties had ceased to work together, constituted inventions made during the employment of the inventors by Fairchild or within six months thereafter, according to the terms of one of the agreements, and that a decree should be made directing the assignment of these applications to Fairchild. These were applications bearing Serial Numbers 116,634, 160,086, 179,878 and 190,063. The counterclaim was later and before the trial amended so as to include similar allegations relative to Serial Numbers 757,920; 198,235; 240,446; 240,448; 54,152 (now patent No. 2,604,415); 673,880 (now patent No. 2,682,101); 104,436 (now patent No. 2,702,525); 238,278 (now patent No. 2,752,265); 240,447 (now patent No. 2,752,268); and an unnumbered application described as 'Casting Light Metal Against Iron, and Articles Formed Thereby,' executed by Whitfield September 13, 1952. The complaint in Fairchild's 'procedural maneuver,' the second of the two actions, charged that the corporate plaintiff in the first action and Whitfield personally 'under the purported and exaggerated guise of a license' from Fairchild had been engaged in actively inducing others to infringe Patents Nos. 2,396,730, 2,435,991, 2,453,772, 2,455,457 and 2,481,962 (the Al-Fin patents), in violation of 35 U.S.C. 271.
 
 
 4
 The complaint in the action by the inventors alleged diversity of citizenship; the complaint in Fairchild's action alleged jurisdiction 'under the Patent Laws of the United States.'
 
 
 5
 We shall now describe the facts in chronological sequence as a background for the discussion of the law points. Where necessary in connection with the discussion of the several legal questions, a more detailed statement of certain groupings of facts will be made.
 
 
 6
 The two inventors had been working with Reynolds Metals Company for some years prior to their association with Fairchild. The interest of Reynolds at that time was in the production of continuous lengths of metal with a thin coating of aluminum. Certain patents in that type of production (the Al-Wac process) were assigned by the inventors to Reynolds (Patent Nos. 2,166,510 and 2,203,606) and there were others. The inventors were also experimenting with other aluminum-coated articles, and 'gadgets,' including a skillet, as their work was not confined to work for Reynolds.
 
 
 7
 There came a time in 1940 when the inventors thought they had perfected a secret process for adding to ferrous metals a thick coating of aluminum. This later became the Al-Fin process, and it consisted in immersing the ferrous article in an aluminum bath so that, at a proper temperature and after the lapse of a proper interval of time, there would form a layer or interface of aluminum alloy bonded to the iron or steel. Against this interface a thick layer of aluminum could then be added by casting, and this thick layer could be machined into any desired shape or form.
 
 
 8
 They sent a piece of steel pipe with a thick aluminum 'slug' around it to Duncan B. Cox, vice-president of Fairchild in charge of the Ranger Engine Division, and Cox showed such interest that the inventors and their lawyer Michael F. Markel were asked to come immediately to Farmingdale for a conference. At that very conference on December 30, 1940 the first agreement between the parties was drafted. It was in the form of a letter to Fairchild and the offer contained in the letter was accepted by Fairchild on January 10, 1941. What the inventors got was employment at $100 a week each for one year plus proper laboratory facilities for their work and a 51% interest in a corporation or partnership to be formed, the new company to become the owner 'of all processes relating to the application of aluminum fins to cylinder barrels' and other processes developed by the inventors 'which relate to the aviation industry.' What Fairchild got was the possibility of solving one of its most pressing problems, on which the success of its Ranger Division might well depend, i.e., the affixing of aluminum fins to the cylinder barrels of its airplane engines, which were of the in-line rather than the radial type, which made it necessary to reduce or dissipate some of the heat, this being a well-known characteristic of aluminum.
 
 
 9
 So the inventors got to work and by September they were able to turn out aluminum-finned cylinders to the satisfaction of the Fairchild engineers. The process was still secret; no disclosures had yet been filed in the Patent Office. Accordingly Al-Fin Corporation was formed, as contemplated in the letter contract of December 30, 1940, and on October 14, 1941 the parties signed a formal contract to 'restate and amplify' their respective rights and obligations. The application for the basic patent (No. 2,396,730) was filed by Whitfield and by Sheshunoff on October 24, 1941.
 
 
 10
 The agreement of October 14, 1941 provides for the 51-49% interest in Al-Fin Corporation, the inventors are employed for 'not less than one year from January 10, 1941' at $100 a week each and Fairchild may extend this for an additional six months at $125 a week each. The inventors are to transfer to the Al-Fin Corporation all inventions and improvements 'which relate to or can be utilized in the aviation industry, or which result from their work directly or indirectly, during any period while they or either of them are in the employ of Fairchild' and for six months thereafter. It is obvious that the exploitation of the fruits of the labors of the inventors is contemplated, as Fairchild agrees 'To use its best efforts in assisting Al-Fin to negotiate license agreements in respect to all Al-Fin owned patent rights.'
 
 
 11
 As to the aircraft industry paragraph Eighth (c) provides that Al-Fin Corporation 'hereby' grants to Fairchild an irrevocable, non-exclusive license, royalty-free, to cover the field. The inventors are to have no interest in this, although it requires little imagination to speculate on the value to Fairchild of this royalty-free license, with World War II in progress, although Pearl Harbor was still a few months away.
 
 
 12
 The inventors were to have their license, which goes to the heart of this litigation, at Al-Fin's option 'but not later than January 10, 1943.' Paragraph Eighth (d) provides:
 
 
 13
 '(d) At Al-Fin's option but not later than January 10, 1943, to grant to the parties of the first part jointly, an irrevocable, exclusive license, royalty-free, to manufacture, use and vend throughout the United States of America and its possessions and in any foreign country, apparatus, equipment, appliances and chattels of any and all kinds and descriptions, and any parts thereof, under and by virtue of any and all of the processes, and/or apparatus and/or products, and improvements thereon, whether or not patented or patentable, which Al-Fin owns, or may be entitled to own, pursuant to and by virtue of the respective assignments herein contained, and under and by virtue of any and all patent rights, including Letters Patent of the United States and foreign countries, and applications therefor, which Al-Fin, its successors and assigns, shall at any time own or become entitled to own, and to grant sublicenses for such manufacture and sale, provided, however, that there is expressly excepted from such license the right to manufacture, use, vend, and lease, products, apparatus and parts (including the right to use such processes for the manufacture or treatment of products, apparatus and parts), which are applicable to, or used, or intended for use, in or by the aviation industry and the automotive engine industry, and also internal combustion engines and finned heat exchangers, and parts for use or application thereto or thereon.'
 
 
 14
 At this point it is too clear for reasonable debate that the inventors were to have 'the pots and pans' and other miscellaneous items, except when 'applicable to, or used, or intended for use in or by the aviation industry and the automotive engine industry, and also internal combustion engines and finned heat exchangers.' It is equally clear that in the process of restatement and amplification the inventors have lost much of what they started with. Fairchild could scarcely have failed to note the revolutionary nature of the Al-Fin process and its adaptability to a multiplicity of uses; and each of the two inventors was still receiving $100 a week, with a possible raise to $125 a week for six months beginning July 10, 1942.
 
 
 15
 The inventors got their raise of $25 a week each but the term of their arrangement expired on July 10, 1942. The time for a further restatement and amplification had evidently arrived, and two agreements were simultaneously executed one on August 27, 1942 between Al-Fin Corporation and the inventors, consented to by Markel, and the other 'as of July 10, 1942,' between Fairchild and Al-Fin. Fairchild's claim is that, by the terms of the agreement of August 27, 1942 the inventors bargained away their right to 'the pots and pans' and miscellaneous items and retained only the right to a license to use and license others to use the Al-Fin process in the production of sheet, strip and wire for commercial purposes, which has never been done and probably never will be done, although Whitfield still has hopes.
 
 
 16
 The agreement 'as of July 10, 1942' provided that Al-Fin would employ the inventors for two years commencing 'as of July 10, 1942' on the terms specified in 'the annexed letter agreement,' which was the agreement of August 27, 1942, i.e., $7500 a year each, and there is an amendment of the October 14, 1941 agreement somewhat enlarging Al-Fin's right to certain processes, apparatus and improvements belonging to Fairchild, with some detailed provisions for services to be performed by Al-Fin for Fairchild and the payment therefor.
 
 
 17
 The agreement of August 27, 1942, in addition to the raise in the remuneration of the inventors, and the stepping of Markel out of the picture, except for his stock interest in Al-Fin and his private arrangement with the inventors, contains a clause (c) to the effect that 'all inventions and patents conceived or acquired by the inventors (except by inheritance and except as waived by you) during the term of our employment shall belong to you, and we shall execute such instruments as may be necessary to make effective assignments to you of any such inventions and patents.' The last two paragraphs are as follows:
 
 
 18
 'g) Paragraph (d) of Article Eighth of the Memorandum of Agreement dated October 14, 1941, shall be and hereby is amended in the following respects: (1) the license to be issued thereunder shall be issued to us; (2) such license shall be limited to the field of aluminum-coated sheet, strip and wire and shall not become issuable or effective during such period as we shall both be employed by you, but thereafter it shall be promptly issued on demand by either of us as of the date when we, or either of us, shall have left your employ; (3) you shall have the right to issue non-exclusive licenses within the field contemplated by our license during the period before our license shall become issuable; and (4) our license shall be an exclusive license for the field specified except that it shall be subject to any outstanding licenses that have been issued by you as herein provided.
 
 
 19
 'h) It is agreed and understood that, except as expressly modified herein, the Memorandum of Agreement of October 14, 1941, shall remain in full force and effect.'
 
 
 20
 As the inventors and their associate Markel had not during this period of huge production of Ranger aluminumfinned airplane engines received any return whatever on their 51% Al-Fin stock, the inventors sold out to Fairchild their stockholdings in Al-Fin. Thus the agreement 'as of the 1st day of September, 1943' was signed. The inventors are employed at what is now described as 'an annual retainer' of $8500 to each for three years for services as 'consulting engineers,' with a right in them of renewal. And the inventors and Markel sold their stock for $12,000 apiece. Of course no net earnings had up to this time been realized by Al-Fin. As a matter of fact, as by the stock purchase above referred to Al-Fin became a wholly owned subsidiary of Fairchild, it was liquidated, and that is how all the Al-Fin patents and the rights under the various agreements with the inventors came to be vested in Fairchild.
 
 
 21
 The interesting part of the agreement 'as of the 1st day of September, 1943,' however, is the following, which, according to Fairchild, gives the coup de grace to any rights the inventors may ever have had to the 'pots and pans' and miscellaneous gadgets, chattels, appliances and whatnot else 'in the field of aluminum-coated sheet, strip and wire':
 
 
 22
 '6. The agreements of October 14, 1941, July 10, 1942 and August 27, 1942, by and between all or some of the parties hereto are hereby terminated and superseded except that Articles First, Second (provided that any inventions or processes developed by Whitfield and Sheshunoff, or either of them, resulting from their work for others as provided in paragraph 2 hereof shall not become the property of Al-Fin or Fairchild), and Eighth (c) (as amended by the provisions of paragraph 4 hereof) and (d) (as amended by paragraph (g) of letter agreement of August 27, 1942) of the Memorandum of Agreement dated October 14, 1941, paragraph (4) of the Memorandum of Agreement dated July 10, 1942, and paragraph (c) of the letter agreement of August 27, 1942, shall continue in full force and effect in accordance with their terms, except as herein expressly restricted or modified and except that Whitfield and Sheshunoff shall have the exclusive right, effective as of the date hereof, to license others in the field of aluminum-coated sheet, strip and wire.'
 
 
 23
 So the inventors and Markel sold out and things went on as before except that the right of the inventors to work for others was enlarged and more precisely defined. Incidentally, this last contract was stated to be non-assignable by the inventors. But they already owned the 'irrevocable, exclusive license, royaltyfree' to be issued not later than January 10, 1043. Nothing prevented them from assigning the rights to and under this license to the corporate plaintiff in the first action, as held by the trial court.
 
 
 24
 There is much testimony, received without objection, to the effect that conversations between Fairchild officials and the inventors and Markel indicated that at all times it was the intention of all the parties that the heavy items such as castings and forgings were reserved to Al-Fin, to whose rights Fairchild succeeded, and Fairchild had the aviation field, but the 'pots and pans' and miscellaneous appliances and chattels were reserved to the inventors. However, the controversy reflected in this litigation lay submerged until the end of World War II was in sight.
 
 
 25
 The record does not disclose precisely when the Fairchild executives first conceived the notion that the inventors' rights under their license could be whittled down to the vanishing point. Prior to the formulation of the phrase 'in the field of aluminum-coated sheet, strip and wire,' which first appeared in the agreement of August 27, 1942, the inventors had insisted on deleting from a draft the introductory word 'a' and substituting 'the,' as noted by the trial judge in his opinion. In November, 1943, the inventors had protested against a definition containing the word 'thin.' But there was little or no friction. Indeed, on January 25, 1944 Whitfield delivered to Fairchild the memorandum of an idea, supplemented by some preliminary experimentation, of using a small quantity of molybdenum, tungsten or chromium to obtain a less brittle interface. We shall examine this more closely when we come to a discussion of Fairchild's counterclaim in the first action .
 
 
 26
 The encroachment by Fairchild on the field encompassed by the license to be issued to the inventors was very gradual, and the license itself was not forthcoming. In early 1944 Fairchild began applying the Al-Fin process to articles in the field of sheet. On February 25, 1944 Al-Fin issued the license to the inventors but it referred only to 'the field of aluminum-coated metal sheet, strip and wire,' and omitted entirely the phrase 'apparatus, equipment, appliances and chattels of any and all kinds and descriptions, and any parts thereof.'
 
 
 27
 In the meantime Cox had decided to fish for himself in the troubled waters and had ceased to be connected with Fairchild. His activities were such that Fairchild sued him and the action came on for trial in the New York State Supreme Court in May, 1944. Fairchild won the suit and obtained an injunction. Fairchild Engine & Airplane Corporation v. Cox, Sup., 50 N.Y.S.2d 643. The importance of this action, however, lies in the fact that Whitfield as a witness for Fairchild gave certain testimony on which Fairchild strongly relies on this appeal, and this testimony will presently be examined in some detail.
 
 
 28
 The tide of World War II had now turned in favor of the Allies. Paris was liberated on August 25, 1944. The encroachment of Fairchild into the inventors' 'field of aluminum-coated sheet, strip and wire' increased. From the first the inventors protested. As early as June of 1944 F. P. Culbert, General Manager of Al-Fin Corporation, who gave orders to the inventors and supervised their work, had reported to Ward, President of Fairchild, that something had to be done. On October 9, 1944 Ward wrote Culbert:
 
 
 29
 'What we desire to do is to find out where our mutuality of interest lies, and whether the agreements have affectuated the intent of the parties concerned and if, in the light of present circumstances, it looks as though the relationship so defined is to the best interest of all concerned with respect to the various fields of endeavor.'
 
 
 30
 There seems no reason to doubt that the expression 'in the light of present circumstances' had reference to the approaching end of the war and the curtailment of government orders which suggests the need on Fairchild's part for new activities, also to the protests by the inventors and the importance of trying to reach some new understanding with them that would permit Fairchild to pursue whatever plans they then were formulating for the 'pots and pans' and miscellaneous articles fabricated out of sheet, strip or wire.
 
 
 31
 In any event the conference suggested in Ward's letter of October 9, 1944 took place on October 23, 1944 and it was a 'turbulent' meeting, according to Whitfield. Ward in effect told the inventors they would get sheet, strip and wire in continuous lengths for commercial use and that was it. The parties were too far apart for further accommodation and the inventors made no concessions. Indeed, if Fairchild's view of the matter were to prevail, the inventors had nothing further to concede.
 
 
 32
 Japan surrendered on August 14, 1945 and on November 13, 1945 counsel for Fairchild, after much beating back and forth among themselves, to which reference will be made shortly, came up with a definition of the phrase first used in the contract of August 27, 1942, and this new and wholly ex parte definition made this litigation merely a question of when the inventors would be in sufficient funds to finance what was bound to be and in fact became a desperately fought and expensive lawsuit. The definition had not the slightest resemblance to anything contained in the contracts or discussed by and between the Fairchild executives and the inventors. It is as follows:
 
 
 33
 "Field of aluminum-coated metal sheet, strip, and wire' is the manufacture of aluminum or aluminum alloy-coated wide or narrow flat metal strip, or metal wire strand, of considerable length, which is so coated while in that long flat strip or long wire strand form, without preforming, shaping, cutting up, or blanking of the defined strip or strand before coating.'
 
 
 34
 With this definition in hand Fairchild was ready to go in the business of 'pots and pans' and miscellaneous chattels fabricated out of aluminum-coated sheet, strip or wire, and it did s0.
 
 
 35
 In this state of affairs it was not long before the inventors ceased to work in the Fairchild plant and they were told to leave on January 24, 1946, although they were for some further time entitled to and they received the payment of their 'annual retainer' until September 1, 1946, according to the terms of the agreement 'as of the 1st day of September, 1943.'
 
 
 36
 The inventors at all times after Fairchild turned to the field of sheet, strip and wire in the fabrication or license of others to fabricate the 'pots and pans' and other miscellaneous chattels protested and asserted their 'rights,' as the trial judge found.
 
 
 37
 'The Field of Aluminum-coated Sheet, Strip and Wire'
 
 
 38
 The trial judge disposed of the principal issue in controversy in Finding 12 as follows:
 
 
 39
 '12. That said contracts and the oral testimony with respect thereto established the fact that the limiting phrase 'field of aluminum coated strip, sheet and wire' meant and was intended to include the application of the Al-Fin Processes, and improvements thereon to sheet, strip or wire in any form, whether the same was in long, flat strip or long wire strand form, or whether such materials had been cut, preformed, shaped, blanked or fabricated into apparatus, equipment, appliances and chattels of any and all kinds and descriptions and any parts thereof which were made from strip, sheet or wire, and whether the Al-Fin Process was applied before or after fabrication, cutting, preforming, shaping or blanking.'
 
 
 40
 Despite Fairchild's arguments to the contrary, this result is arrived at: (1) by construing the language appearing on the face of the contracts themselves; and (2) by also holding that this 'seems to be a reasonable interpretation in the light of all the testimony.' We agree.
 
 
 41
 Once the relationship of the parties and the Al-Fin processes are understood, and the maze of patents and patent applications penetrated, the fog and confusion generated by the unnecessarily complicated issues are readily dissipated and the contracts are found clearly to state precisely what the inventors have claimed from the beginning of the controversy.
 
 
 42
 The agreement of October 14, 1941 restricts (Eighth (c)) Fairchild's license to: '(1) aircraft engines, aircraft type engines and/or parts thereof; (2) aircraft and/or parts thereof; and (3) apparatus or equipment and/or parts thereof, intended for use or application to, on or with aircraft * * * provided that Fairchild shall not have the right under said license to manufacture or process cylinders or other engine parts for other manufacturers, or engines or other aircraft parts other than Fairchild without Al-Fin's consent * * *.'
 
 
 43
 The inventors' license (Eighth (d)) is to be 'to manufacture, use and vend * * * apparatus, equipment, appliances and chattels of any and all kinds and descriptions, and any parts thereof' under the Al-Fin processes, and to 'grant sublicenses' for such manufacture and sale. Products, apparatus and parts for 'the aviation industry and the automotive engine industry, and also internal combustion engines and heat exchangers' are 'expressly excepted from such license.'
 
 
 44
 The agreement of August 27, 1942 by paragraph (g) thereof amended paragraph Eighth (d) so as to limit the license 'to the field of aluminum-coated sheet, strip and wire.' There are other changes in the 'terms and conditions' of the employment of the inventors, but the only amendment of paragraph Eighth (d) of the agreement of October 14, 1941 is to limit the 'field' of the license. The effect is merely to change paragraph Eighth (d) to read: 'to manufacture, use and vend * * * apparatus, equipment, appliances and chattels of any and all kinds and descriptions, and any parts thereof' under the Al-Fin processes 'in the field of aluminum-coated sheet, strip and wire.' It is provided that, 'except as expressly modified herein, the Memorandum of Agreement of October 14, 1941, shall remain in full force and effect.'Moreover, nothing in the agreement 'as of the 1st day of September, 1943' affects said paragraph Eighth (d) as thus amended. The earlier agreements are 'terminated and superseded' 'except that Articles * * * and Eighth * * * (d) (as amended by paragraph (g) of letter agreement of August 27, 1942) of the Memorandum of Agreement dated October 14, 1941 * * * shall continue in full force and effect in accordance with their terms * * *.' Moreover, the use of the words 'the field of' prior to 'aluminum-coated sheet, strip and wire' suggests a broader interpretation of the inventors' rights than Fairchild would have us conclude.
 
 
 45
 Thus the first ground upon which the trial judge decided the principal issue in the case was that there was nothing ambiguous about the written agreements, that the language employed by the parties could only have one meaning, as above explained; and we are of the same view.
 
 
 46
 Following the reasoning of the trial judge, we shall now assume arguendo that in the context of the series of agreements the meaning of 'the field of aluminum-coated sheet, strip and wire' can only be fully revealed by considering the course of dealing between the parties and their conduct. Despite Fairchild's arguments to the contrary, we again agree with the trial judge that 'in the light of all the testimony' and 'the voluminous evidence as to the attitude and conduct of the parties in construing the several contracts or licenses' the same result is arrived at. And it is here that we inevitably run into issues of credibility and a variety of factual inferences such as a trier of the facts commonly deals with.
 
 
 47
 Fairchild leans far too heavily upon certain testimony given by Whitfield in the Cox case. Taken literally and out of context Whitfield's statement in 1944 'We have a license from Fairchild, to use the Al-Fin process to manufacture aluminum-coated strip, sheet and wire for commercial sale' may seem of some comfort to Fairchild. But the nature and scope of the license were not in issue in the Cox case. Whitfield was merely answering questions on direct examination designed to bring out the fact that he had an interest in the profits of Al-Fin and hence an interest in the outcome of the litigation. Indeed in the Cox case Whitfield mentioned the fact that his license was defined by certain contracts. Suffice it to say that the trial judge accepted Whitfield's explanation at the present trial to the effect that his testimony in the Cox case was incomplete and that his understanding of the nature and scope of his license when he testified in the Cox case was the same as the understanding he described to Judge Reeves in this case.
 
 
 48
 Fairchild refers to the inventors' use of the words 'strip' and 'wire' and so on in certain patent applications filed in 1936, and in later advertisements and correspondence. But such usage has little bearing on the present controversy and in fact tends to emphasize the broader scope intended by the carefully-selected phrase 'the field of aluminum-coated sheet, strip and wire' as used and referred to in the contracts between the parties.
 
 
 49
 We agree that Fairchild's own definition of the meaning of the controversial phrase, formulated long after the parties were at odds over the extent of the field reserved for the inventors, is entitled to consideration as part of 'the conduct of the parties.' But this ex parte expression, in the light of the effort expended upon its formulation by Fairchild's lawyers, and against the background of earlier negotiations described in the testimony of Markel and Whitfield, is so contradictory of the language of the agreements themselves, as we have already interpreted them, and so different from what were the rights of the inventors as expressed in the conversations and negotiations above referred to, as to make this definition a damaging piece of evidence against Fairchild rather than in its favor. It is to be noted that Ward did not testify, nor did the lawyer who was principally concerned in the drafting of the definition.
 
 
 50
 In large part the dealings of the inventors were necessarily with Culbert, who was their immediate superior representing Fairchild. As he was no longer living at the time of the trial he could not testify for Fairchild; but the fact remains that the testimony of conversations with him is uncontradicted, and the documentary evidence of Culbert's participation is strongly corroborative of Whitfield's testimony and that of others. For example, in 1945 Vita Craft Corporation wrote to Fairchild for information relative to the use of the Al-Fin process 'for post-war work in connection with cooking utensils,' and, after some further correspondence Culbert wrote to Vita Craft on December 7, 1945:
 
 
 51
 'This company has given the exclusive rights on aluminum coating of strip, sheet and wire to Messrs. Whitfield and Sheshunoff, who are the inventors of its bonding processes. This matter will, therefore, be brought to their attention and I believe you will hear from them directly.'
 
 
 52
 Taking such incidents with all the other evidence in the record, including the conversations indicating the parties' intention to reserve the heavy items for Fairchild but to leave the rest to the inventors, we do not see how the trial judge could have arrived at any conclusion on the facts and the law than the one he did.
 
 The Counterclaim
 
 53
 The large number of inventions claimed in the counterclaim to belong to Fairchild dwindled to the Whitfield and Sheshunoff Patent No. 2,682,101 and to Patent Application Serial No. 757,920, filed on June 28, 1947, which was in its progress through the Patent Office, split into 240,446, 240,447 and 240,448. The last of these three was abandoned and came to nothing. 240,446 matured into Patent No. 2,800,707, issued July 30, 1957; and 240,447 became Patent No. 2,752,268, issued on June 26, 1956. Fairchild apparently does not contest the decision below to the effect that Fairchild has no rights whatever in or to 2,682,101. In any event, it is clear beyond shadow of doubt that this patent was developed by the inventors in connection with their work for Climax Molybdenum Company and P. R. Mallory Company, and this work was done in strict accordance with the terms of the contractual relationship with Fairchild and, as found by the trial judge, 'with the knowledge and consent of Fairchild.'
 
 
 54
 The history of Application Serial No. 757,920 may be briefly described. On January 25, 1944, while the inventors were working for Fairchild, Whitfield made some preliminary experiments with molybdenum, tungsten and chromium and thought small quantities of these metals might reduce the thickness of the aluminum alloy bond. He delivered a memorandum to this effect to Fairchild and counsel prepared an elaborate Patent Application purporting to describe the new invention as relating to the basic Al-Fin Application Serial No. 416,328, filed October 24, 1941, that became Patent No. 2,396,730. He sent this form of application, together with a form of assignment, stated to be of the invention described in 'the application for United States Letters Patent therefor executed concurrently herewith.' The inventors signed and returned the assignment but they did not sign the application. The reson was plain enough, as described by Whitfield and corroborated by all the documents in evidence. At that time the inventors merely suspected that the desired effect might be produced by the use of molybdenum, tungsten and perhaps also chromium. But they were metallurgists of great skill and reputation and knew that elaborate tests and much further research were necessary before any invention along these lines could be then preoccupied with a variety of other then preoccupied with a varties were matters and this particular one was permitted to remain dormant for some time. Besides, Fairchild's counsel had told them 'to review this application with unusual care before it is filed.'
 
 
 55
 On March 7, 1946, while the inventors were still working for Fairchild, Whitfield brought the subject up again, in a memorandum of that date to Fairchild. He described their original memorandum of January 25, 1944 as 'a rough survey' and recommended 'that a more comprehensive program be started on this project.' The result was a conference at the office of Fairchild's counsel on July 18, 1946. Whitfield's testimony of what occurred at this conference is brief and explicit. He said:
 
 
 56
 'Q. If you have an explanation, go ahead. A. I wanted to say this, if you will recall in this connection, Mr. Free, we had a meeting in your office to discuss whether or not we should assign this application and complete the turning over of invention to Fairchild.
 
 
 57
 'I believe that meeting was held in July of 1946, if I recall correctly. At that meeting we discussed whether the invention had been properly made, whether we had enough data to take it to the patent office, or whether it was incomplete.
 
 
 58
 'At that time it was decided jointly by Fairchild's representatives, yourself, and Victor and myself that we did not have the backing up data to take the patent through, and it should be waived. You did not want to follow through on it and accordingly we took over the work later on after we left Fairchild.'
 
 
 59
 There is nothing whatever to support any claim that Whitfield misrepresented the facts, nor do we find such a claim openly asserted in Fairchild's briefs. Indeed, photomicrographs of the experiments taken by Fairchild's engineer, Frederick M. Zapp, would make such a claim nothing short of fantastic. Thus Fairchild abandoned, or in the language of one of the contracts 'waived' any right to this incipient invention, which might or might not ever be found to amount to anything. Under the circumstances it was quite natural that Fairchild decided not to put any of its money into researches and experiments that seemed at the time unpromising.
 
 
 60
 The assignment and the application were inextricably bound together by the terms of the contract that contemplated the assignment to Fairchild of inventions developed by the inventors while in Fairchild's employ. See Kurz v. United States, D.C.S.D.N.Y.1957, 156 F.Supp. 99, 103, affirmed per curiam, 2 Cir., 1958, 254 F.2d 811; Nau v. Vulcan Rail & Construction Co., 1941, 286 N.Y. 188, 36 N.E.2d 106; In re Herzog, 1950, 301 N.Y. 127, 93 N.E.2d 336; 3 Corbin, Contracts Section 549 (1951 Ed.). Moreover, in the light of the factual background above described, it is clear to us that the parties never intended the assignment to take effect independently of the application. Fairchild voluntarily abandoned or waived any rights in the application and in the assignment.
 
 
 61
 The aftermath is of little consequence. Even if the inventors had in fact later completed the necessary work and found that the precise invention reported in their 'rough survey' of January 25, 1944 was in all respects sound and even if they applied for and received a patent for this very invention, Fairchild would not be entitled to any interest in it in view of Fairchild's abandonment and waiver of any such interest. It is nothing short of absurd to characterize the inventors' June 28, 1947 Application Serial No. 757,920 as 'surreptitiously filed.' True, the later application, especially its subdivision Serial No. 240,447 (Patent No. 2,752,268), as noted by the trial judge in Finding No. 42, contained 'many of the disclosures' noted in the application prepared by counsel for Fairchild, and a good deal of it verbatim. But what of that? Subdivision Serial No. 240,448 related to the use of chromium and nothing came of it 'because it lacked patentability.' Subdivision Serial No. 240,446 (Patent No. 2,800,707) was based on the coating of iron or steel bodies with a barrier layer of molybdenum and it bore no relationship to the Memorandum of January 25, 1944 or to the application prepared by Fairchild's counsel that the inventors left unsigned.
 
 
 62
 Thus we also affirm in all respects the decision of Judge Reeves dismissing the counterclaim on the merits.
 
 
 63
 The Issue of Alleged Inducement to Infringe
 
 
 64
 The final major issue is the subject of the second action, the one brought by Fairchild against the inventors' corporation and against Whitfield personally and which was described by the trial judge as a 'procedural maneuver.'
 
 
 65
 Fairchild maintains that five patents belonging to Fairchild were infringed by licensees of Whitfield & Sheshunoff, Inc. and that said infringement was induced by the inventors and their corporation in violation of 35 U.S.C. 271(b).[1] Four of the allegedly infringed patents were inventions of Whitfield and Sheshunoff assigned eventually to Fairchild. The fifth relates to a bi-metallic piston invented by one Stevens.
 
 
 66
 As the trial court indicated, Fairchild's claims of infringement are quite strained and not all were timely made. But there is, we think, no occasion for a technical discussion of those various patents for the simple reason that there is no proof whatever that the inventors induced any infringement.
 
 
 67
 Fairchild did show that the inventors licensed a piston manufacturer, Gillette & Eaton, but only 'to use any applicable inventions' which the inventors had 'the right to license.' The inventors enumerated their inventions, grouping the Al-Fin patents separately, with the notation: 'Right to use patents in this group assigned to Fairchild Engine & Airplane Corp. except in the field of strip, sheet and wire, which rights remain with Whitfield & Sheshunoff, Inc., in the form of an exclusive license.'
 
 
 68
 Fairchild asserts that, in addition to granting a license of this nature, the inventors furnished written instructions as to 'bonding procedures' describing recommended methods for performing the licensed process, including those covered by the Al-Fin patents. However, the inventors specifically directed their licensee to use a non-infringing process and, of course, they had a perfect right to explain the use of the Al-Fin process in their designated field. The trial court's conclusion that the 'licenses granted by Whitfield & Sheshunoff' were 'within the scope' of the inventors' rights and are 'proper licenses' is thus amply borne out by the evidence and we need not detail Fairchild's belabored miscellany of other contentions of this phase of the case.
 
 
 69
 Miscellaneous Law Points Raised by Fairchild
 
 
 70
 The test of whether Section 53 of the N.Y.Civil Practice Act applies (the 10-year limitations statute) rather than Section 48 (the 6-year limitations statute for breach of contract) is whether the remedy at law is adequate. Hearn 45 St. Corp. v. Jano, 1940, 283 N.Y. 139, 27 N.E.2d 814, 128 A.L.R. 1285; Potter v. Walker, 1937, 276 N.Y. 15, 11 N.E.2d 335; Hanover Fire Ins. Co. v. Morse Dry Dock & Repair Co., 1936, 270 N.Y. 86, 200 N.E. 589; Rundle v. Allison, 1866, 34 N.Y. 180; see Spiegelberg, The New York Statute of Limitations Applicable to Actions in Equity Based on Legal Rights, 1941, 18 N.Y.U.L.Rev. 182. Of course, the mere fact that equitable relief is sought will not lead to the application of the 10-year limitations period. Keys v. Leopold, 1925, 241 N.Y. 189, 149 N.E. 828; Cohen v. Hughes, 1943,291 N.Y. 698, 52 N.E.2d 591. And where the legal remedy is equally sufficient to meet plaintiff's needs, the fact that plaintiff has an equitable remedy also will not change the applicable limitations period. The legal limitations period is controlling.
 
 
 71
 In this case it is plain that the legal remedy is not adequate. The inventors not only seek damages for breach of contract but an accounting for profits wrongfully obtained by Fairchild, a declaratory judgment as to the extent of their rights, and an injunction to prevent future violations. Certainly an injunction which will avoid a multiplicity of litigation is a remedy that an action at law could not duplicate. Since the legal remedy is inadequate, Section 48 is inapplicable and the 10-year span of Section 53 controls.
 
 
 72
 The contention by Fairchild that the District Court's construction of the phrase 'field of aluminum coated strip, sheet, and wire' is too broad in that it includes products used in the aviation and automotive engine industries, is without substance. These rights, admitted by all to belong to Fairchild, are specifically reserved by paragraph Eighth (d) of the October 14, 1941 agreement. Thus the broad construction given to the quoted words does nothing more than interpret the generality to which later exceptions expressly protect Fairchild's rights.
 
 
 73
 The future right of Fairchild to grant licenses under the Al-Fin patents is in no way curtailed by the second paragraph of the judgment. The opinion and decree make it perfectly clear that Fairchild's rights outside the area of the 'field of sheet, strip and wire' are not affected.
 
 
 74
 Fairchild's complaint that the decree makes it responsible for license agreements in prohibited fields even though the licensee did not invade these areas is unjustified. Although there does not appear to be any authority on the point, it seems clear that if Fairchild derived any profits from licensing on forbidden ground, it is irrelevant whether the licensee avails himself of this 'privilege.' As the decree states, for all benefits reaped through license agreements in the field of strip, sheet and wire Fairchild is properly accountable.
 
 
 75
 Affirmed.
 
 
 
 [1]
 35 U.S.C. 271(b) provides:
 'Whoever actively induces infringement of a patent shall be liable as an infringer.'