HENRY A. NAU, Respondent, *v.* VULCAN RAIL & CONSTRUCTION COMPANY, Appellant.

Argued June 2, 1941; decided July 29, 1941.

*James I. Cuff* and *James I. McGuire* for appellant. Plaintiff, as a matter of law, wholly failed to prove any cause of action, particularly the cause of action alleged in the second amended complaint. (*Schweinburg* v. *Altman*, 145 App. Div. 377; *Gans* v. *Ætna Life Ins. Co.*, 214 N. Y. 326.) The defense of payment was established as a matter of law. (*Danziger* v. *Hoyt*, 120 N. Y. 190; *Riley* v. *Mayor*, 96 N. Y. 331; *Matter of Wood*, 251 App. Div. 141.) The court committed reversible error in its charge to the jury and in its refusal to charge as requested by the defendant. (*Brainard* v. *New York C. R. R. Co.*, 242 N. Y. 125; *Wendel Foundation* v. *Moredall Realty Corp.*, 282 N. Y. 239; *Hopwood Plays, Inc.*, v. *Kemper*, 263 N. Y. 380; *First Nat. Bank* v. *National Surety Co.*, 228 N. Y. 469; *Cream of Wheat Co.* v. *Crist Co.*, 222 N. Y. 487.)

*Myron J. Greene, Frederick W. Appell* and *Walter K. Pick* for respondent. The question of the interpretation and meaning of the agreement was one of fact which was properly submitted to and determined by the jury. (*Columbia & N. R. R. Co.* v. *Chandler*, 241 Fed. Rep. 261; *Kendall* v. *Winsor*, 62 U. S. 322; *Detroit Iron & Steel Co.* v. *Carey*, 236 Fed. Rep. 924; 242 U. S. 649; *Evans* v. *Jordan & Morehead*, 13 U. S. 199; *Atwater & Co.* v. *Panama R. R. Co.*, 246 N. Y. 519; *Mecca Realty Co.* v. *Kellogg Toasted Corn Flakes Co.*, 166 App. Div. 74; 221 N. Y. 724; *Matter of People* [*Bond & Mortgage Guarantee Co.*], 267 N. Y. 419;

*Becker* v. *Frasse & Co.*, 255 N. Y. 10; *Utica City Nat. Bank* v. *Gunn*, 222 N. Y. 204; *Lamb* v. *Norcross Bros., Inc.*, 208 N. Y. 427; *Wirth & Hamid Fair Booking, Inc.*, v. *Wirth*, 265 N. Y. 214.) The issue raised by the defense of payment presented a question of fact for the jury's determination. (*Fuller* v. *Kemp*, 138 N. Y. 231; *Mance* v. *Hossington*, 205 N. Y. 33; *Schuttinger* v. *Woodruff*, 259 N. Y. 212; *Leidy* v. *Proctor*, 226 App. Div. 322.)

RIPPEY, J. Upon the causes of action set up in the complaint, the plaintiff recovered a jury verdict against defendant in the sum of $5,701.77 with interest from July 1, 1935. The verdict was based upon the construction placed by the jury upon a written contract between the parties, whose wording was held by the court to be ambiguous, in such a way as to permit of recovery of one-half of plaintiff's expenses in defending an interference proceeding in the United States Patent Office. Defendant also had recovery on the first counterclaim set up in the answer for $2,041 with interest from September 1, 1937, which was set off against plaintiff's recovery and judgment was entered in favor of plaintiff for the difference with costs. The jury found in favor of plaintiff on defendant's second counterclaim. The Appellate Division unanimously affirmed and the case is here by our permission. The fundamental question to be considered on plaintiff's case is whether he presented facts sufficient to establish the cause of action upon which his recovery is based.

Prior to July, 1931, plaintiff was an inventor and a designer of machines essentially of mechanical movements, was engaged in business under the name and style of American Turnstile & Supply Company and had filed an application in the United States Patent Office then claimed by him to cover improvements on mechanical turnstile mechanisms, with special reference to silencing arrangements therein. He had no plant of his own and did not manufacture turnstiles but those he sold were subcontracted and manufactured by others under his supervision. Defendant was a general contractor for supplies and equipment but did not manufacture turnstiles.

Before June, 1931, the Board of Transportation of the City of New York had advertised for bids for 300 turnstiles for installation in the Eighth Avenue Subway and plaintiff interviewed officers of defendant with reference to bidding on the contract. Another contractor, the Perey Company, claimed to have patent protection on turnstiles desired by the city and, to plaintiff's knowledge, notified various contractors who might become bidders that they should refrain from giving consideration to turnstiles proposed by plaintiff. After the question of patent infringement by plaintiff's devices was discussed between plaintiff and defendant's officers and investigated by defendant, plaintiff represented to and assured defendant that the devices of his application did not infringe or conflict in any way with the Perey or other patents. The contract which the city proposed to make with the successful bidder was discussed between plaintiff and defendant's officers with special attention to clause XVI which provided for saving the city against expense or loss from infringement. Plaintiff had in mind and understood that he would be obligated to save the city harmless from expense, loss or damage arising from or growing out of infringement were his devices adopted and that he would also be required to protect any successful bidder furnishing such devices against such a guaranty in the city contract and also against liability of the contractor for infringement. He then knew that any profits that might be derived from a sale of such devices to defendant could not be finally determined until a decision was reached that the question of such liability on such guaranties was no longer open. As to all of that, the plaintiff testified.

On the strength of plaintiff's representations and assurances, defendant undertook to procure the contract. Plaintiff furnished defendant verbally with a quotation on the turnstiles, defendant filed its bid and was awarded a contract known as L-12. Among other things, the contract, so far as material, contained the following provision:

" Article XVI. Infringement of patents. The Contractor agrees that he will at his own expense defend all suits

or proceedings instituted against the City and pay any award of damages assessed against the City in such suits or proceedings, insofar as the same are based on any claim that the Equipment, or any part thereof, or any tool, article or process used in the completion thereof, constitutes an infringement of any patent of the United States  *  *  *. In case such equipment is in such suit held to constitute infringement and its use is enjoined, the Contractor, within a reasonable time, and at his own expense, will either secure for the City the right to continue using said equipment by suspension of the injunction, by procuring for the City a license or otherwise, or will replace such equipment with non-infringing equipment or modify it so that it becomes non-infringing or remove the said enjoined equipment and refund the sums paid therefor, and reimburse the City for all transportation and installation costs of such equipment."

On July 8, 1931, the defendant, in writing, accepted plaintiff's verbal quotation as follows:

" We herewith accept your verbal quotation for furnishing approximately 223 Low Type Turnstiles at a price of $240.00 each and approximately 78 High Type Turnstiles at $260.00 each.

" The above prices are f. o. b. our truck, 314 Dean Street, Brooklyn, N. Y.

"All of these turnstiles are to be made in accordance with plans and specifications of the Board of Transportation, New York City, known as their Contract #L-12, and is subject to their inspection, approval and acceptance.

" In accepting this order, it is distinctly understood that you guarantee to defend and save this Company harmless from any infringement suits, threatened or actually brought forth for infringements or alleged infringements arising from our Purchase Sale or use of these turnstiles.

" Deliveries are to be made as required by the terms of our contract with the Board of Transportation mentioned above."

■

The plaintiff was unable to finance the contract or manufacture the turnstiles and apparently was unable to finance himself during the period necessary for manufacture. He had arranged with the Fred Goat Company of Brooklyn for the manufacture of the machines and with others for supplies, etc. He had no credit to go forward with the manufacture of the devices. Thereupon, on the same day that defendant had accepted plaintiff's proposal for the manufacture and delivery of the machines, the parties entered into a written agreement which recited the agreement whereby defendant contracted with plaintiff for the manufacture and delivery of the turnstiles, that it was the intention of the parties to organize a corporation to take over, manufacture and sell turnstiles in accordance with certain applications for letters patent which were then pending in the name of the plaintiff in the United States Patent Office, and then provided that, in consideration of defendant's guaranteeing the plaintiff's accounts with the manufacturers and furnishers of materials and supplies needed for the manufacture of the turnstiles, the plaintiff would pay over to defendant the entire net profits derived from the sale of the machines, such net profits to be the difference between the net actual cost to plaintiff plus an overhead charge of a salary of one hundred dollars per week to be paid to him plus office expenses not to exceed sixty dollars per month until the delivery of the machines, and then follows this clause: " The said VULCAN RAIL AND CONSTRUCTION COMPANY agrees to hold the said sum to be paid herein as profits in escrow for a period of two years from the date of payment and to pay therefrom any costs of litigation or damages resulting therefrom which may arise out of or grow from the infringements of any patent in the manufacture or sale of such turnstiles or any suit, claims, costs or damages arising out of the abovementioned contract, and when the said period of two years shall have expired the VULCAN RAIL AND CONSTRUCTION COMPANY shall pay over to HENRY A. NAU for his own use and benefit 50% of such profits remaining

after the above costs, expenses, etc., if any, shall have been paid, and shall retain for its own use and benefit the remaining 50% thereof."

All of the turnstiles were delivered to, inspected, approved and accepted by the city of New York during the fall of 1931 and early in 1932 and defendant received payment in full. All moneys it received were turned over to plaintiff from which he deducted the cost of manufacture and other expenses in connection with the enterprise and there was left a net profit after the aforesaid deductions, including his weekly salary overhead, of $26,710.40, which sum he delivered to the defendant on February 2, 1932, to be held in escrow in accordance with the provisions of the contract.

At the time the contracts were entered into plaintiff had no patents on the devices which were sold to the city. On November 29, 1930, he had filed in the United States Patent Office an application for a patent involving the inventions claimed to have ultimately gone into the turnstiles. A division apparently occurred in the Patent Office, with the result that he received one patent, No. 1,844,784, on a portion of his invention on February 9, 1932, and the application, Serial No. 499,043, was continued on the balance of his claims. Some time after the contract between the parties was executed, one Kelton filed an application in the Patent Office allegedly upon the same invention, whereupon an interference was declared. Two other claimants to the same invention were brought in and the interference proceeding was carried on over many months. In that litigation plaintiff succeeded and the second patent was thereupon issued to him on May 3, 1938.

On October 13, 1934, plaintiff in due form and for sufficient consideration, by a written instrument under seal, transferred and assigned the patent which had already issued, the then pending application and all inventions embodied therein and all his inventions, applications for patents and patents relating to turnstiles and devices applicable thereto or to be associated therewith, together with all foreign patents and the right to obtain foreign patents on

said inventions, and his good will and business and all assets in connection with his turnstile business, except accounts and bills receivable, to the Perey Company and agreed to aid the latter in the prosecution or defense of the Kelton interference proceeding then pending in the United States Patent Office to a conclusion and final determination and any other interference proceedings that might arise. By the terms of the assignment the plaintiff covenanted that he would cease manufacturing turnstiles and would not engage in the business of manufacturing or handling turnstiles for a period of fifteen years and that he would, by suitable instruments, turn over to the assignee any inventions in connection therewith that he might subsequently make. In addition to the $2,500 consideration mentioned in the assignment, Perey was to pay to plaintiff, and ultimately did pay him, some $15,000, representing the aggregate of from $60 to $70 per turnstile which Perey was manufacturing and selling to the city.

From time to time after February 2, 1932, defendant loaned moneys to plaintiff with which to pay his expenses in the interference proceeding and for other purposes and received notes from plaintiff for such loans. On November 9, 1934, defendant paid to plaintiff $884.60 which, with the aggregate loans, amounted to exactly one-half of the profits held by defendant in escrow plus earned interest, returned the notes and received a written receipt from plaintiff " in full and final settlement of my share of reserve fund set up out of profits on operations covering the manufacture of Turnstiles for the Eighth Avenue Subway — Contract L-12, account of the City of New York." Plaintiff agrees that he received one-half of the net profits held in escrow by defendant. Still he sues here on the written contract between the parties, making no claim that there was ever any other agreement, oral or written, between him and defendant and asserts that the contract as written, in express terms or by necessary implication, binds defendant to reimburse him for one-half of his expenses in the interference proceeding on the theory that a successful defense

of that was necessary to ward off infringement suits and consequent liability under the guaranties.

The contract between the defendant and the city of New York was referred to in defendant's acceptance of plaintiff's offer and substantially made a part thereof, and the last writing referred to and substantially made the acceptance a part of it. All three instruments were executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one (*Marsh* v. *Dodge*, 66 N. Y. 533, 537, 538; *Meriden Britannia Co.* v. *Zingsen*, 48 N. Y. 247; *Matter of Board of Commissioners of Washington Park*, 52 N. Y. 131; *Knowles* v. *Toone*, 96 N. Y. 534; American Law Institute, Restatement of Contracts, § 235 [c]). Even though they had been made at different dates, that fact would not affect the rule since they were to effectuate the same purpose and formed a part of the same transaction. When the instruments are read as one, clearly on the question of indemnity the purpose of the parties was to protect the city and defendant against *infringement suits* or *claims arising or growing out of infringement* through the manufacture, purchase, sale or use of the turnstiles. The wording of the instruments is plain and unambiguous upon that point.

Plaintiff, however, has so far successfully contended that *an interference proceeding* in the United States Patent Office was embraced within the terms " *infringement suits* " and " infringement " as those expressions were used in the contract. Much evidence extrinsic of the contract was introduced by plaintiff, over defendant's objection and exception, designed to show that the parties so intended and there was evidence claimed to show that practical construction by the parties ⸰ of the language used so indicated. The court charged the jury: " It is for you to determine in the light of all the evidence before you what was the agreement upon which the minds of the parties met on July 8th, 1931. It is for you to determine from all the evidence in the case the sense in which the words of the written agreement were used by the parties thereto. You are to determine this

from all the circumstances surrounding the making of the agreement as you find them to have existed, and from the practical construction put on the agreement by the acts and conduct of the parties after the making of the agreement as it appears from the evidence." The court further instructed the jury that while in the technical sense of the law of patents an interference is an entirely different proceeding from a suit for an infringement of a patent, the sense in which those words were used in the contract was to be determined by them.

When connected with patents and patent practice, the words and expressions " infringement," " infringement suits," " interference " and " interference proceedings " are words and expressions of art and have a definite, technical and well-understood meaning. Both parties, as plaintiff testified, knew the difference in meaning. The words " infringement " and " interference " are not synonymous and an " interference " proceeding is not an " infringement suit." The purpose of an *interference proceeding* is to determine in advance of the issue of a patent the question of priority of invention (30 Cyc. 892, 893). No *infringement suit* may be maintained by anyone at any time on a pending application for a patent (*Rein* v. *Clayton*, 37 Fed. Rep. 354). It is only after the patent issues that such a suit may lie (*Gayler* v. *Wilder*, 10 How. [U. S.] 477, 493). Technical words in a contract must be taken in a technical sense unless the context of the instrument or a usage which is applicable clearly indicates a different meaning (American Law Institute, Restatement of Contracts, § 235 [b]). There was no evidence of usage and the context of the contract indicates no different meaning.

The contract was plain and unambiguous upon its face and the intent of the parties is clearly indicated by the language used. " The construction of a plain contract is for the court. The intention of the parties is found in the language used to express such intention. (*Hartigan* v. *Casualty Co. of America*, 227 N. Y. 175.) If the court finds as matter of law that the contract is unambiguous, evidence of

the intention and acts of the parties plays no part in the decision of the case. Plain and unambiguous words, undisputed facts, leave no question of construction except for the court. The conduct of the parties may fix a meaning to words of doubtful import. It may not change the terms of a contract" (*Brainard* v. *N. Y. C. R. R. Co.*, 242 N. Y. 125, 133).

The language of the contract clearly indicates that protection against infringement was the sole purpose of the indemnity clauses. It is presumed that the contract, prepared by an attorney, was drawn with reference to applicable law. An infringement suit could lie, if ever, against the city and the contractor only when brought by a person other than the plaintiff who owned a patent containing valid claims which were infringed. Both parties knew that plaintiff had no patent. Both knew that all he had was a pending application for a patent. It is so recited in the contract. No interference was pending when the contract was made. So far as the indemnity clauses were concerned, it was no concern of defendant whether an interference arose or not or whether a patent was ever issued to plaintiff since neither circumstance would bar an infringement suit by a stranger to the contract who was the owner of a patent covering the turnstiles. The words used in the contract have a precise, definite and well-understood meaning when used in connection with the subject-matter of the contract and the courts are not permitted to explore the actuality of the intent of the parties. Its plain terms indicate that there was no intent or purpose of the parties to give to the indemnity clauses a meaning and purpose other than the plain, unambiguous and well-understood words and expressions used import. There is nothing in the contract on which recovery by plaintiff may be predicated. There was nothing in the evidence which furnished any basis for reimbursement of plaintiff for expenses he incurred in the interference proceeding in the Patent Office out of defendant's one-half share of the profits arising from the manufacture, sale and delivery of the turnstiles to the city. No

infringement suits were brought or threatened nor were claims presented arising or growing out of infringement. Exceptions were noted to denial of defendant's motions for nonsuit. Defendant adequately and fully protected itself by exceptions to the charge and to refusal of the court to charge as requested to enable it to present the question of the propriety of the court's submitting to the jury the construction properly to be placed on the contract as a question of fact. The evidence was insufficient to warrant recovery by plaintiff and it was, therefore, error for the trial court to deny defendant's motions for a nonsuit and a dismissal of the complaint.

Under defendant's first counterclaim, a verdict was rendered for defendant for $2,041 and judgment authorized for that sum with interest from September 1, 1937. This claim arose out of moneys advanced by the defendant to plaintiff to finance other litigation to which we need give no attention here. Liability of plaintiff therefor was conceded. Neither party appealed from the judgment so far as it affected the first counterclaim so that is not before us for review and we have no power to disturb it (*Wilson* v. *Mechanical Orguinette Co.*, 170 N. Y. 542, 553).

Defendant's second counterclaim arose out of alleged damages which it suffered by virtue of the failure and refusal of the plaintiff to perform that part of the contract which provided for the turning over of plaintiff's application and patents to a corporation to be jointly owned by the parties. Evidence appears which was designed to show that plaintiff disposed of his patents to the Perey Company with defendant's consent, and that defendant abandoned that part of the contract or, at least, failed to perform conditions precedent to any requirement of plaintiff to perform. The issues raised on that counterclaim were properly submitted to the jury as questions of fact and we find no error of law in connection with such submission or in the trial involving the issues which warrants a reversal.

Defendant appealed to the Appellate Division from the judgment thus entered and from each and every part thereof.

Obviously it could not appeal and did not intend to appeal from that portion· of the judgment in its own favor. Although the separate recoveries were based upon the same transaction, the causes of action were clearly separable and submitted to the jury as separate causes of action, the verdicts were rendered separately upon them and separate amounts were claimed on each cause of action and could be easily separated from the judgment rendered in gross. Under such conditions we have power to render such judgment as the law of the case and as justice requires (Civ. Prac. Act, § 584; *Freel* v. *County of Queens*, 154 N. Y. 661, 664, 666; *Fisher* v. *Wakefield Park Realty Co.*, 203 N. Y. 539; *Wilson* v. *Mechanical Orguinette Co.*, 170 N. Y. 542, 553; *Picard* v. *Lang*, 3 App. Div. 51; *Haughey* v. *Belmont Quadrangle Drilling Corp.*, 286 N. Y. 584).

The judgments in so far as they allow recovery by plaintiff should be reversed and the complaint dismissed upon the merits, with costs to the appellant in all courts; the judgments as to the second counterclaim should be affirmed and the case remitted to the trial court to enter judgment for the defendant upon its first counterclaim in the sum of $2,041 with interest from September 1, 1937.

LOUGHRAN, FINCH, LEWIS and CONWAY, JJ., concur; LEHMAN, Ch. J., and DESMOND, J., dissent.

Judgment accordingly.