James C. THOMAS, Individually and as Trustee of the SLT Trust #1 (Rev.): 9/29/83, Plaintiff,

v.

Earl Raymond PRICE, Individually and as Trustee of the Elaine Price Trust, 1984, Elaine Price and E. Lawrence Price, Individually and as Trustee of the Elaine Price Trust, 1983, Defendants.

No. 86 Civ. 1082 (PKL).

United States District Court, S.D. New York.

March 6, 1986.

Niewald, Waldeck, Norris & Brown, Kansas City, Mo., Speyer, Thurm, Perlberg & Heller, New York City, for plaintiff; Kevin E. Glynn, Kansas City, Mo., John Speyer and Julian Singer, New York City, of counsel.

Holleb & Coff, Chicago, Ill., Shea & Gould, New York City, for defendants; William I. Goldberg, Chicago, Ill., Michael Lesch and Eric L. Grahame, New York City, of counsel.

## OPINION AND ORDER

LEISURE, District Judge:

This action for injunctive and declaratory relief was instituted by plaintiff in Supreme Court, New York County and removed to federal court by defendants pursuant to 28 U.S.C. § 1441. Subject matter jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332.

The nature of the relief sought by plaintiff is described herein. For the reasons set forth below, plaintiff's application for injunctive and declaratory relief is denied.

### I. FINDINGS OF FACT

1. Plaintiff James C. Thomas ("Thomas") is the Trustee of the SLT Trust #1 (Rev.): 9/29/83 ("SLT Trust"), a trust created under the laws of the State of Missouri.

2. Defendant E. Lawrence Price ("E.L. Price") is the Trustee of the Elaine Price Trust, 1983 ("Price Trust I"), a trust created under the laws of the State of Wyoming. In the Declaration of Trust of the Price Trust I, defendant Elaine Price, the

wife of E.L. Price, was named both grantor and beneficiary. Defendant Earl Raymond Price is E.L. Price's father and the trustee of the "Price Trust II" (*see infra*, Finding of Fact ¶ 8).

3. On or about November 4, 1983, the SLT Trust and the Price Trust I entered into a partnership agreement ("Partnership Agreement") for the acquisition and operation of the Church & Thomas Bank (Unincorporated) (the "Bank"), a private bank located in Galveston, Texas, of which Thomas was at that time part owner. The general partnership thus created ("Partnership") is governed by the Uniform Partnership Act of the State of Texas, as amended. Partnership Agreement § 1. Both the SLT Trust and the Elaine Price Trust I entered the Partnership Agreement as equal partners, each holding a 50% interest. *Id.* § 5.

4. Also on November 4, 1983, the SLT Trust and the Price Trust I each borrowed $750,000 from Newcomb Securities ("Newcomb"), a business owned by the family of E.L. Price, and of which E.L. Price is the managing and general partner. These loans were designed, in part, to fund each Trust's capital contribution to the Partnership.

5. In consideration for the loans, each Trust separately executed a non-recourse promissory note to Newcomb, under the terms of which each Trust agreed to pay Newcomb $750,000 with interest on or before November 7, 1985 (the "Non-Recourse Notes"). Each Trust also executed separate security agreements with Newcomb in order to secure their respective loans. Under the security agreement entered into between plaintiff and Newcomb ("SLT–Newcomb Security Agreement"), Newcomb was granted a security interest in the SLT Trust's "right, title and interest in its interest in the Partnership, as such interest is defined by Section 26 of the Uniform Partnership Act of the State of Texas." SLT–Newcomb Security Agreement § 1. New-

comb was also given a security interest in whatever "proceeds" the SLT Trust received from its interest in the Partnership. *Id.* The Agreement further provided that Newcomb would have "no right to interfere in the management, administration, affairs, or control of the Partnership," in the absence of an "Event of Default." *Id.* Elsewhere in the Agreement, an "Event of Default" was defined to include the failure of the SLT Trust to pay the Non-Recourse Note to Newcomb "when due," provided that such failure continued for ten days after written notice of default. *See id.* § 4.1(a). (*N.B.* The relevant provisions of the SLT–Newcomb Security Agreement are set forth more completely, *infra*, in Part II.B of this opinion).

6. Subsequently, the Partnership formally acquired the Bank. Pursuant to the terms of the Partnership Agreement, a four-person Management Committee was appointed to manage the Bank. The Committee thus appointed consisted of Thomas, Bernard Gram, E.L. Price, and Peter Jacoby. The latter two were designated by the Price Trust I; the former two by the SLT Trust.

7. On or about November 16, 1983, the Management Committee, acting on the Bank's behalf, entered into separate contracts for management assistance with Thomas and E.L. Price. Under those contracts, Thomas was appointed the Bank's General Manager and E.L. Price its Chairman. In September 1984, Thomas and E.L. Price, by mutual agreement, stopped receiving management fees under the management assistance contracts. *E.L. Price Affidavit* ¶ 11.[1]

8. From the time of the Partnership's inception in November 1983, Thomas and E.L. Price had numerous disagreements over business. *See id.* ¶ 12. On or about November 5, 1985, Newcomb, in anticipation of SLT's possible default on its Non-Recourse Note, assigned said Note, along

[1] Thomas maintains that the fees unpaid since September 1984 have merely accrued, and that he is still entitled to receive them. Although that view is not shared by E.L. Price, the dispute agreement is essentially a collateral dispute that does not relate directly to the matters before the Court.

with the SLT–Newcomb Security Agreement, to the Elaine Price Trust, 1984 ("Price Trust II"). *Id.* In consideration for the assignment, Newcomb received a full recourse promissory note for $750,000, due November 7, 1985, from the Price Trust II. The trustee of the Price Trust II is Earl Raymond Price, E.L. Price's father and also a defendant in this lawsuit. Elaine Price is the Trust's grantor.

9. On November 7, 1985, the SLT Non-Recourse Note came due. By that date, neither Thomas nor the SLT Trust had made payment on the Note to either Newcomb or its assignee. *See Affidavit of James C. Thomas* ¶ 10 ("Thomas Affidavit").[2] By letter dated November 8, 1985, Earl Raymond Price, in his capacity as trustee of the Price Trust II ("Price Trustee"), advised Thomas, as trustee of the SLT Trust ("Thomas Trustee"), of Newcomb's assignment of the Non-Recourse Note and the SLT–Newcomb Security Agreement. *Id.* ¶ 9. In the same letter, Thomas Trustee was given formal notice of the SLT Trust's default on the Non-Recourse Note. *E.L. Price Affidavit* ¶ 15. Pursuant to the terms of the SLT–Newcomb Security Agreement, Price Trustee demanded payment within ten days of notice of default. *Id.* To date, payment has not been made on the Note. *See Thomas Affidavit* ¶ 10.

10. By letter dated November 26, 1985, Price Trustee notified Thomas Trustee of the Price Trust II's intention to retain the SLT Trust's "interest in the Partnership" in accord with § 4.2 of the SLT–Newcomb Security Agreement in satisfaction of the SLT Trust's obligations under the Non-Recourse Note, unless Price Trust II received a written notice of objection within 21 days of November 26. Thomas Trustee was also put on notice that the Price Trust II defined such Partnership interest as "all rights, interests and powers of [the SLT Trust] in or with respect to the Partnership, including the right to cast any vote or otherwise exercise any power in connection with the management of the Partnership." Finally, Thomas Trustee was notified that in the event that Price Trustee did receive written objection from Thomas Trustee, that the "Collateral," *i.e.*, the Partnership, would be disposed by private or public sale as authorized by § 9–505(2) of the Uniform Commercial Code ("UCC").

11. By letter dated December 11, 1985, Thomas' Houston counsel notified Price Trustee that it objected to any disposal of the SLT Trust's Partnership pursuant to § 9–505 of the (Texas legislature's enactment of) the UCC. Instead, Thomas' counsel insisted that "any disposition of the subject collateral must be pursuant to Section 9–504 of the Code" and further requested that Thomas Trustee receive notice of any public or private sale. Thomas' counsel further advised Price Trustee that whatever rights the Price Trust II intended

---

**2.** Thomas originally stated that the reasons for such nonpayment were "not relevant" to the present application for injunctive and declaratory relief. *Affidavit of James C. Thomas* ¶ 10. When defendants pressed the point, Thomas explained, both in a reply affidavit and in live testimony in the proceedings herein, that his decision not to pay the amount due on the Non-Recourse Note was based on the failure of the Price interests to honor two agreements to indemnify the Thomas Construction Company (owned by Thomas) for payments totalling $750,000. *See Hearing Transcript February 18–20, 1986* at 100–06. Thomas' view, as summarized by the Court, is that the Thomas Construction Company entered into these indemnity agreements (referred to collectively by the parties as "the Stanhope Transaction") as a "quid pro quo" for the money loaned to the SLT Trust by Newcomb. *See id.* at 106.

Notwithstanding Thomas' newly expressed view herein that the conduct of the Price interests with regard to the Stanhope Transaction justifies the SLT Trust's default on its Non-Recourse Note, this Court now makes an informed finding that the Stanhope Transaction is indeed "not relevant" to the present proceedings, *see Affidavit of James C. Thomas* ¶ 10. This finding is based, in large part, on the simple fact that the Stanhope Transaction is nowhere mentioned in either the Partnership Agreement or the Security Agreement. Moreover, this Court's finding that the Stanhope Transaction represents a dispute collateral to the present lawsuit is reinforced by the fact that Thomas intends to bring a separate lawsuit to recover the amounts allegedly owed to the Thomas interests as a result of the Stanhope Transaction. *See Hearing Transcript February 18–20, 1986* at 104.

to exercise under the Note and Security Agreement were limited by the terms of the Partnership Agreement. In the aforesaid letter, Thomas' counsel stated that in light of Section 17 of the Partnership Agreement, as well as Section 26 of the Texas Uniform Partnership Act,

"exercise of the Price Trustee's security interest does not permit Price Trustee to exercise any powers or rights of control or management, including the right to cast any vote or otherwise exercise any power in connection with the management of the partnership, which partnership rights and powers will remain vested in Thomas Trustee."

12. By letter dated December 20, 1985, Price Trustee notified Thomas Trustee that since the SLT Trust was still in default on the Non-Recourse Note, a private sale of the collateral would be held "on or after January 8, 1985" [sic]. Thomas Trustee was also notified that in order to preserve the collateral, as permitted by sections 1 and 4.2 of the Security Agreement, Price Trustee (acting with the consent of the Bank's other partner, E.L. Price), had appointed Earl Raymond Price and Elaine Price to replace Thomas and Bernard Gram on the Bank's Management Committee. Thomas was further notified that the newly constituted Management Committee had appointed E.L. Price Managing Partner and General Partner of the Bank.

13. By letter dated December 30, 1985, Thomas' counsel formally objected to the replacement of Thomas and Bernard Gram on the Management Committee.

14. By letter dated January 2, 1986, counsel for the Price interests ("Prices' counsel") notified Thomas Trustee that the reference in the December 20 letter to "January 8, 1985" as the date for the sale

of collateral had been a typographical error, and that the date should have been "January 8, 1986." Price's counsel further indicated that in order "to insure the legal sufficiency of the notice," a private sale of the collateral would in fact be delayed until or after January 14, 1986.

15. In a separate letter also dated January 2, 1986, the Prices' counsel informed Thomas' counsel that the proposed sale of the SLT Trust's Partnership interest would be "abandoned" if, by the close of business on January 7, 1986, Thomas made the Price Trust II a written offer to purchase, for a specified cash price, the SLT Trust's interest in the Partnership. Following receipt of such offer, the letter stated, the Price Trust II would elect (within 48 hours) either to sell the Partnership interest to Thomas at the terms stated or buy the interest on those same terms (after deducting principal and interest owed by the SLT Trust on the Non-Recourse Note).

16. In a meeting held between attorneys for the parties on January 6, 1986, Thomas' counsel declared that: i) Thomas Trustee would not buy the SLT Trust's Non-Recourse Note; and ii) that unless E.L. Price met Thomas' demands with regard to an unrelated transaction known as "the Stanhope Matter" (see supra, note 2), Thomas was prepared to take steps to prevent the Bank from continuing to do business, particularly by means of bringing various matters to the attention of the Texas Banking Commission. *E.L. Price Affidavit* ¶ 23.

17. In a letter sent from Thomas' counsel to the Prices' counsel dated January 7, 1986, objections were made with regard to a certain transaction known as the "Enterprise Transaction" that the Bank had engaged in without Thomas' approval.[3] In

---

**3.** Thomas describes the "Enterprise Transaction" as follows:

"[J]ust prior to December 31, 1985, [E.L. Price] deposited approximately $1.5 million in the Bank in the form of a certificate of deposit on behalf of Newcomb Securities Company. Simultaneously however, he had the bank make a loan of approximately $1.5 million to Enterprise Partners, Ltd.[,] an entity in which

he is the principal. The loan from the bank was evidenced by an *unsecured* note payable by Enterprise Partners, Ltd. to the Bank and having a term of six days. These transactions were undertaken by Mr. Price without informing me and completely without my consent as General Manager of the Bank."
*Thomas Affidavit* ¶ 15 (emphasis in original). This Court takes no position with regard to

the same letter, objection was also made as to the commercial reasonableness of any private sale of the collateral to either E.L. Price or a Price affiliate.

18. By letter dated January 8, 1986, the Prices' counsel defended the Bank's conduct in the Enterprise Transaction by pointing out that the subject loan had been repaid in full on January 6, 1986. Furthermore, the Prices' counsel informed Thomas that if he had any information that he thought would be relevant to the Texas Banking Commission, he should simply provide the Commission with such information. Finally, the Prices' counsel indicated that any private sale of the SLT's Partnership interest would be conducted in a manner that would assure its commercial reasonableness, and that notice of such sale to Thomas Trustee as had already been made was entirely sufficient.

19. By letter dated January 9, 1986, the Prices' counsel informed Thomas' counsel that, prior to any sale of the collateral, Thomas Trustee would be given notice and an opportunity to purchase the collateral at substantially the same terms as those provided for in the proposed sale.

20. Subsequently, by letter dated January 17, 1986, the Prices' counsel gave Thomas Trustee notice that the private sale of the collateral would take place on January 28, 1986. The letter stated that, as of the date of maturity of the SLT Trust's Non-Recourse Note, November 7, 1985, the Note had a principal balance due of $750,-000 and interest due of $169,756. The letter further indicated that, under the proposed terms of the private sale, the SLT Trust's Partnership interest would be sold by the Price Trust II either to E.L. Price or by the Price Trust I for: i) a cash price of $169,756 (equal to the interest owed on the SLT Trust's Note); and ii) the purchaser's absolute and unconditional assumption of the $750,000 full recourse note that had been executed by the Price Trust II and would be due and payable to Newcomb on November 7, 1986. Finally, the letter indicated that Thomas Trustee was being given the opportunity to purchase the SLT Trust's Partnership interest from the Price Trust II prior to the private sale, for "substantially the same terms."

21. In essence, the SLT Trust could retain its Partnership interest by paying the Price Trust II all interest owing on the SLT Non-Recourse Note, and by converting its overdue non-recourse note to a full recourse note that would be due and owing on November 7, 1986.

22. By letter dated January 22, 1986, Thomas Trustee informed Price Trustee that if any purchaser of the SLT Partnership interest attempted to interfere with any of Thomas' management interests in the Bank, Thomas would "take all steps necessary to protect the interests of both the Bank and the SLT Trust, including invoking the supervision of the Texas banking Commissioner." In the same letter, Thomas Trustee also asked for copies of: i) the Price Trust II full recourse promissory note to Newcomb; ii) the financial statements of E.L. Price, Newcomb Securities Company, Newcomb Securities Company, Inc., and the Price Trust II; and iii) the trust agreements for the Price Trust I and the Price Trust II. Thomas Trustee asked for copies of these documents in order to review the terms of the Price Trust II's proposed sale of the SLT Trust Partnership interest.

23. Subsequently, some of the information sought by Thomas Trustee was provided by the Prices' counsel by letter dated January 23, 1986.

24. On or about January 23, 1986, the Honorable Walter M. Schackman, Justice of the Supreme Court, New York County, issued an *ex parte* temporary restraining order against defendants, enjoining them, as well as anyone acting in concert with them, from "asserting or attempting to assert any management rights in, or control of the Church & Thomas Bank (Unincorporated) pursuant to the [SLT–Newcomb Security Agreement]." Furthermore, the TRO enjoined defendants from "selling,

plaintiff's assertions that the Enterprise Transaction was improper.

transferring, assigning or negotiating [the SLT Trust Non-Recourse Note]."

25. The TRO issued by Justice Schackman was originally set to expire at a hearing scheduled for February 6, 1986 on plaintiff's application for a preliminary injunction. On February 5, 1986, defendants removed plaintiff's action to federal court.[4]

26. On February 14, 1986, following oral argument, the Court denied plaintiff's motion to remand these proceedings to state court. At that time, a hearing on plaintiff's application for a preliminary injunction was scheduled for February 18, 1986. That hearing in fact took place on February 18, 19 and 20. During the course of that hearing, pursuant to Fed.R.Civ.P. 65(a)(2), this Court informed the parties that it would advance the trial of this action on the merits and consolidate it with the hearing on the motion for injunctive relief.[5] Accordingly, it is now within this Court's province to grant or deny all the relief sought by plaintiff in this action.

27. Essentially, plaintiff seeks a declaratory judgment to the effect that the Partnership interest of the SLT Trust assigned to Newcomb under the SLT–Newcomb Security Agreement in no way entitles Newcomb's successors in interest to assert any management rights in, or control of, the Church & Thomas Bank. Furthermore, plaintiff seeks to (permanently) enjoin the Price Trust II or any successive holders of the SLT Trust Partnership "interest" from using the SLT–Newcomb Security Agreement as a basis for asserting any management rights in, or control of, the Church & Thomas Bank.[6]

**4.** The TRO issued by Justice Schackman has remained in effect, either by operation or law or by consent of the parties, until the date of this decision.

**5.** As soon as the parties convened before the Court on February 18, they were alerted to the possibility that an order of consolidation might be issued pursuant to Fed.R.Civ.P. 65(a)(2). *See Hearing Transcript February 18–20, 1986* at 3–4. From that point forward, the parties were encouraged to make a full record given the possibility that the Court might order consolidation (as the Court eventually did order before the close of the hearing on February 20). Thus, I am satisfied that the parties were given notice of consolidation "sufficient to give them an adequate opportunity to present their case." *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 101 (2d Cir.1985).

**6.** In plaintiff's final memorandum of law, submitted to the Court on February 26, 1986, plaintiff states that the relief sought could properly be embodied in an Order in plaintiff's favor stating as follows:

(a) Earl Raymond Price, individually and as trustee of the Elaine Price Trust 1984, is the assignee of the entire right, title and interest of Newcomb Securities Company in a certain Non-Recourse Promissory Note and Security Agreement dated November 4, 1983 and signed by James C. Thomas, as Trustee of the SLT Trust # 1 (Rev.): 9/29/83;

(b) That said note which became due on November 4, 1984 has not been paid;

(c) That as a result of the aforesaid assignment, Earl Raymond Price, as Trustee of the Elaine Price Trust, 1984, is the owner of the partnership interest of the SLT Trust # 1 (Rev.): 9/29/83 in a partnership under a Partnership Agreement dated November 4, 1983 (Pl.Ex. 3) between James C. Thomas, as Trustee of the SLT Trust # 1 (Rev.): 9/29/83 and E. Lawrence Price, as Trustee of the Elaine Price Trust, 1983.

That the partnership interest is found to be and limited to, by Section 26 of the Texas Uniform Partnership Act, the right to any "profit and surplus" of the partnership.

That the partnership interest so acquired by Earl Raymond Price, as Trustee of the Elaine Price Trust, 1984 does not include any right to the specific property of the partnership and does not include any right to management or control.

Now, therefore, it is ordered and determined by the Court that Earl Raymond Price as Trustee of the Elaine Price Trust, 1984, as the assignee of Newcomb Securities Company is the owner of the partnership interest of the SLT Trust # 1 (Rev.): 9/29/83 in a certain partnership which is embodied in a partnership agreement between James C. Thomas, as Trustee of the SLT Trust # 1 (Rev.): 9/29/83 and E. Lawrence Price, as Trustee of the Elaine Price Trust, 1983, dated November 4, 1984, which partnership interest is limited to a right to fifty percent of the profits and surplus of the partnership. It is further ordered that Earl Raymond Price, as Trustee of the Elaine Price Trust, 1984, is enjoined from attempting to control or sell or controlling or selling any of the specific property of the partnership. It is further ordered that Earl Raymond Price, as Trustee of the Elaine Price Trust, 1984, is enjoined from attempting to exercise or exercising any right to management or control in the said partnership.
Plaintiff's Memorandum of Law (February 26, 1986) at 2–3.

## II. CONCLUSIONS OF LAW

In deciding whether or not to grant plaintiff permanent injunctive relief, the court must necessarily first determine whether plaintiff has prevailed on the merits. *See Smithkline Beckman Corp. v. Proctor & Gamble Co.*, 591 F.Supp. 1229, 1235 (N.D. N.Y.1984), *aff'd mem.*, 755 F.2d 914 (2d Cir.1985). In the instant case, in order to prevail on the merits, plaintiff must prove that the Partnership "interest" assigned to Newcomb as security for the Non-Recourse Note under the SLT–Newcomb Security Agreement in no way entitled Newcomb, or Newcomb's successors in interest (such as the Price Trust II, which purchased the Note from Newcomb) from participating in the management of the Bank.

Plaintiff's position is that the "interest" assigned to Newcomb in the SLT–Newcomb Security Agreement was strictly limited to the SLT Trust's interest in the Bank's "profits and surplus," and under no circumstances did the assigned interest encompass the SLT Trust's right to participate in the management of the bank. Plaintiff argues that this conclusion follows ineluctably from an examination of Texas partnership law, as well as from an examination of both the Security Agreement and the Partnership Agreement. It is that argument that this Court must now examine in detail.

### A. *The Nature of an Assigned Partnership Interest under Texas Partnership Law*

Section 1 of the SLT–Newcomb Security Agreement specifically states that the nature of the SLT Trust's Partnership "interest" is defined by section 26 of the Texas Uniform Partnership Act ("Texas U.P.A."). Furthermore, the Partnership Agreement between the SLT Trust and the Price Trust I is generally governed by the Texas U.P.A. *See* Partnership Agreement § 1.

Under the Texas U.P.A., a partner's interest is defined as the partner's share of the "profits and surplus." Tex.Rev.Civ. Stat.Ann. art. 6132b § 26 (Vernon 1970). This interest in profits and surplus is per-

sonalty, *id.*, and is a property right of a partner clearly distinguishable from the partner's "right to participate in the management" of the partnership. *See id.* § 24. It does not ensue, however, that a partnership interest, as conveyed, can never encompass the right to participate in partnership management. Indeed, section 27(1) of the Texas U.P.A. states as follows:

> A conveyance by a partner of his interest in the partnership does not of itself dissolve the partnership, nor, *as against the other partners in the absence of agreement,* entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs; it merely entitles the assignee to receive in accordance with his contract the profits to which the assigning partner would otherwise be entitled and, for any proper purpose, to require reasonable information or account of partnership transactions and to make reasonable inspection of the partnership books.

*Id.* § 27(1) (emphasis added).

Section 27 of the Texas U.P.A., on its face, contemplates the possibility that the assignee of a partner's interest might be entitled to participate in management decisions, provided that the non-assigning partner(s) agree to such participation. Such a conclusion is not necessarily inconsistent with the general proposition that the assignee of a partnership interest may not interfere in the management of the partnership. *See* Bromberg, *Crane and Bromberg on Partnership* § 42 at 240 (West 1968). An examination of the cases in which this general rule has been invoked reveals that courts have been primarily concerned with the need to protect non-assigning partners from unwanted interference in partnership business. *See Beckley v. Speaks*, 39 Misc.2d 241, 240 N.Y.S.2d 553 (N.Y.Sup.Ct.1963) (in action by non-selling partner, purchaser of partnership interests of two of three partners in liquor store business found to have acquired selling partners' share of profits and surplus but not any right to interfere in partnership

business), *aff'd*, 21 A.D.2d 759, 251 N.Y. S.2d 1015 (1st Dept.), *appeal dismissed*, 15 N.Y.2d 546, 202 N.E.2d 906, 254 N.Y.S.2d 362 (1964); *Valley Springs Holding Corp. v. Carlson*, 56 S.D. 163, 227 N.W. 841 (S.D.1929) (mortgagee who acquired partnership interest held not entitled to interfere in management or administration of partnership business).

In protecting a non-assigning partner from undesired interference in partnership business by third parties, courts are simply giving effect to the Uniform Partnership Act's directive that "[n]o person can become a member of a partnership interest without the consent of all the parties." Tex.Rev.Civ.Stat.Ann. art. 6132b § 18(g) (Vernon 1970); *accord* N.Y. Partnership Law § 40(7) (McKinney 1948).

Thus, it is reasonable for defendants to rely on section 27(1) of the Texas U.P.A., *supra*, in arguing that Newcomb or its successor in interest is entitled, now that the SLT Trust has defaulted on its obligation to pay the Non-Recourse Promissory Note, to participate in the management of the Bank. Nonetheless, plaintiff argues with considerable force that section 27(1), standing alone, should not compel this Court to conclude that Newcomb or its successors are now entitled to participate in management of the Bank.

Plaintiff argues that the SLT Trust, notwithstanding its assignment to Newcomb, remains one of the "other partners" whose consent is required before Newcomb or its successors can "interfere" with partnership management. *See* Tex.Rev.Civ.Stat.Ann. art. 6132b § 27(1) (Vernon 1970). Such agreement, of course, might possibly be

found in the SLT–Newcomb Security Agreement, the instrument in which plaintiff actually assigned its partnership interest. Plaintiff also argues, however, that the SLT Trust cannot be found to have assigned its right to participate in the Bank's management if such assignment is proscribed by the Partnership Agreement. *Cf. Park Cities Corp. v. Byrd*, 534 S.W.2d 668, 672 (Tex.1976) (though relevant provisions of Texas U.P.A. are useful as "an interpretive aid," the agreement of the parties is controlling in deciding whether a partner's capital deficit should be considered a partnership asset).

Plaintiff's insistence that the agreement of the parties ought to be controlling is justified. *See Chatten v. Martell*, 333 P.2d 364, 368, 166 Cal.App.2d 545 (1958) (in determining what rights or interests pass under an assignment of a partnership interest, intention of parties as manifested in relevant instruments is controlling). Accordingly, having found that, under the Texas U.P.A., the assignment of a partnership interest may, under the circumstances, encompass the assignment of management rights, the Court must now turn to the relevant agreements to discern whether such a broad assignment was indeed effected in this case.

B. *The Relevant Agreements* [7]

Plaintiff argues that the partnership interest assigned to Newcomb as security for the Non-Recourse Promissory Note was strictly limited to plaintiff's interest in its share of profits and surplus. In support of his position, plaintiff cites the first sen-

---

7. The parties agree that, under section 7 of the SLT-Newcomb Security Agreement, the New York law of contracts governs interpretation of the Security Agreement. While it is true that, under section 25 of the Partnership Agreement, Texas law governs that instrument, it is also true that the intent of the parties relevant to the resolution of the present dispute can be determined solely by reference to the Security Agreement and those sections of the Partnership Agreement that have been incorporated by reference into the Security Agreement. Accordingly, this Court is convinced that it would be both fair and proper to apply the New York law of

contracts in determining the intent of the parties as to the breadth of the partnership interest assigned by plaintiff. In this regard, it is worth noting that neither plaintiff nor defendants have alerted this Court to any differences between Texas law and New York law that might materially affect this Court's construction of the relevant agreements. *See Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294 (2d Cir.1986) (the Court did not feel obliged to undertake an investigation of the differences between the laws of two jurisdictions where the parties relied on case authorities for only one jurisdiction).

tence of section 1 of the SLT-Newcomb Security Agreement. That sentence states:

> *Security Interest.* To secure the payment and performance of the obligations and liabilities of Debtor [*i.e.*, SLT Trust] to Secured Party [*i.e.*, Newcomb] pursuant to the [Non-Recourse] Note, including the payment of principal and interest under the Note, Debtor hereby grants, conveys, assigns, transfers, and hypothecates to the Secured Party a security interest in and to all of the Debtor's right, title, and interest in the Partnership, as such interest is defined by Section 26 of the Uniform Partnership Act of the State of Texas, and the proceeds thereof (the "Collateral").

Plaintiff argues that this sentence demonstrates that the parties expressly chose to define the key term "partnership interest" by reference to that section of Texas Partnership law that specifically limits such interest to "profits and surplus." *See* Tex.Rev.Civ.Stat.Ann. art. 6132b § 26 (Vernon 1970). This Court should therefore conclude, plaintiff argues, that SLT Trust and Newcomb never intended for the interest assigned to Newcomb to encompass the separate right to participate in partnership management. In essence, plaintiff is asking the Court to apply the principle of *"inclusio unius est exclusio alterius "*[8] in order to find that the express inclusion of a limited statutory definition of the term "interest" excludes the possibility that the parties might have intended that such interest be more broadly defined.

Although the doctrine of *inclusio unius est exclusio alterius* may be applied to the interpretation of contracts, *see, e.g., Two Guys From Harrison-N.Y., Inc. v. S.F.R. Realty*, 63 N.Y.2d 396, 404, 472 N.E.2d 315, 317–18, 482 N.Y.S.2d 465, 468 (1984) (citation omitted), it is only an aid to interpretation, and should not be applied to defeat contractual intent that is otherwise manifest. *Cf. McKinney's Statutes* § 240 at 414 (1971). Here, any presumption that

the interest conveyed to Newcomb could *never* encompass the exercise of management rights is clearly rebutted by the sentence in the Security Agreement immediately following the one relied upon by plaintiff. That sentence states:

> In the absence of an "Event of Default" (as hereinafter defined), the Secured Party shall have no right to interfere in the management, administration, affairs, or control of the Partnership.

SLT-Newcomb Security Agreement § 1.

Unless this sentence is to be rendered meaningless, it must be construed to mean that, if an "Event of Default" does occur, Newcomb or its successors in interest would have the affirmative right to interfere in the "management, administration, affairs, or control" of the Bank, presumably to protect the secured party's newly-acquired interest. *See 67 Wall Street Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248, 333 N.E.2d 184, 186, 371 N.Y.S.2d 915, 918 (1975) ("words are never to be construed as meaningless if they can be made significant by any reasonable construction") (citations omitted). This interpretation takes on added significance because, under section 4.1(a) of the Security Agreement, the failure by the SLT Trust to pay its Note when due, when such failure is not cured within ten days after written notice of demand, constitutes an "Event of Default." Thus, if defendants' interpretation of the Security Agreement is correct, Newcomb or its successors have been entitled to exercise management rights in the Bank ever since plaintiff defaulted in its obligation on the Non-Recourse Note in November, 1985.

At the consolidated hearing on plaintiff's application for injunctive relief, plaintiff attempted to reconcile the two sentences of section 1 of the Security Agreement in plaintiff's favor by introducing evidence of previous drafts of the Security Agreement as well as the testimony of Bernard Jung, one of the draftsmen of the Agreement.

---

**8.** "The inclusion of one is the exclusion of another." *Black's Law Dictionary* 906 (Rev. 4th ed. 1968). In the area of statutory interpreta-

tion, the maxim is more commonly referred to as *"expressio unius est exclusio alterius."* *See McKinney's Statutes* § 240 (1971).

At that time, the Court ruled that the introduction of such evidence was barred by the parol evidence rule, especially since the terms of the Security Agreement could not actually be regarded as ambiguous.[9]

Upon consideration, this Court now concludes that any conflict arising from the juxtaposition of the two sentences of section 1 of the Security Agreement is only an apparent conflict, one that can and should be reconciled by giving effect to both sentences. *See Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390, 395–396 (2d Cir.1985); *see also* 22 N.Y.Jur.2d *Contracts* § 221 (1982) ("Since no provision of a contract should be left without force and effect, that interpretation of a contract is favored which will make every part of it effective, or which gives meaning to every provision. As a corollary to this rule, that construction of a contract which will render a clause absolutely meaningless should be avoided.") (citations omitted).

■ Once this approach is adopted, it becomes obvious that the two sentences of section 1 of the Security Agreement should be construed together to have the following meaning: The SLT Trust's assignment of its interest in the Bank Partnership to Newcomb as security will be no more than an assignment of the SLT Trust's share in the Bank's profits and surplus, *unless* there is an "Event of Default." If such an "Event of Default" occurs, however, the interest assigned to Newcomb will expand to include the right to "interfere" in the management, administration, affairs, or control of the Bank.

This construction is not inconsistent with the other relevant provisions of the Security Agreement and the Partnership Agreement. Section 4.2(ii) of the Security Agreement states that:

> [u]pon the occurrence of an Event of Default, the Secured Party shall have, in addition to all the rights and remedies of a secured party under the Uniform Commercial Code, the right to ... take possession of any or all of the Collateral but subject to and only to the rights of surviving or liquidating partners pursuant to Paragraphs 17, 18, and 19 of the partnership agreement ... which agreement ... is made a part hereof to the same extent and with the same effect as if copied herein.

Also, upon the occurrence of an "Event of Default," the Secured Party is entitled to

---

**9.** "[T]he threshold decision on whether a writing is ambiguous is the exclusive province of the court." *Sutton v. East River Savings Bank,* 55 N.Y.2d 550, 554, 435 N.E.2d 1075, 1077, 450 N.Y.S.2d 460, 462 (1982) (citing Patterson, *Interpretation and Construction of Contracts,* 64 Col. L.Rev. 833, 839). In this instance, the Court's finding of no ambiguity was influenced in no small part by the testimony of plaintiff's own witness (Bernard Jung, who represented plaintiff in drafting the Security Agreement), who stated on cross-examination that the pertinent language in the Security Agreement was clear and unambiguous. *See Hearing Transcript February 18–20, 1986* at 54–55. Given this admission, the Court had no reluctance in excluding the evidence proffered by plaintiff, since "[i]n the absence of ambiguous terms, [the court has] no occasion to resort to a consideration of the circumstances existing when the contract was entered into, the situation of the parties or the subject matter of agreement." *Benderson Development Co., v. Schwab Bros. Trucking Inc.,* 64 A.D.2d 447, 456, 409 N.Y.S.2d 890, 897 (4th Dept.1978) (citations omitted); *see Nau v. Vulcan Rail & Constr. Co.,* 288 N.Y. 188, 198, 36 N.E.2d 106, 111 (1941).

It should be added that the Court did not grant defendants' motion to strike the testimony of Bernard Jung before he had testified at considerable length and been examined by plaintiff's counsel on direct and re-direct. *See Hearing Transcript February 18–20, 1986* at 22–77. Similarly, previous drafts of the Security Agreement were excluded by the Court as evidence only after plaintiff had offered each of the drafts to the Court for inspection. Indeed, copies of these previous drafts remained taped on the wall directly behind the bench during most of February 18 and 19. The point here is simply that, although the Court eventually agreed with defendants' contention that evidence of prior negotiations should be barred by the parol evidence rule, the Court was influenced in its ruling by the fact that hours of testimony by plaintiff's witness failed to demonstrate with any measure of certainty that defendants' position as to contractual intent was incorrect. Moreover, plaintiff's own witness admitted that he had been unable to convince his codraftsman (representing Newcomb) to adopt contractual language that would have clearly supported plaintiff's position in this lawsuit. *See id.* at 71–72.

"sell, dispose of, hold, use or lease any or all of the Collateral as the Secured Party in its sole discretion shall decide but subject to ... [the] rights of surviving or liquidating partners as may be permitted under Paragraphs 17, 18 and 19 of the Partnership Agreement." Security Agreement § 4.2(iii).

Thus, upon the occurrence of an "Event of Default," the power of Newcomb or its successors in interest to use, hold or dispose of the SLT Trust's Partnership interest is triggered. This power is circumscribed, however, by the rights of "surviving or liquidating partners" as defined in paragraphs 17, 18 and 19 of the Partnership Agreement.

Section 17(c) of the Partnership Agreement states that:

> [e]ach partner (or his successor in interest) shall be free and privileged to hypothecate or grant a security interest in all or any part of its interest in the partnership, as such interest is defined by Section 26 of the Uniform Partnership Act of the State of Texas. Such hypothecation or grant of security interest shall not dissolve the partnership nor in any way affect or diminish each partner's continuing right to management and control of the partnership nor entitle the secured party to interfere in the management or administration of the partnership business or affairs.

Plaintiff contends that section 17(c) indicates that both the SLT Trust and the Price Trust I are prohibited by the Partnership Agreement from assigning management rights to a secured party. As defendants point out, however, section 17(c) need not be read so broadly. The provision clearly means that a partner's hypoth-

ecation or grant of a security interest, *when made*, does not permit the secured party to participate in management. And, certainly, defendants do not contend that Newcomb acquired management rights when plaintiff granted the security interest in 1983. Defendants do contend, however, that section 17(c) of the Partnership Agreement has nothing to do with the rights of a secured party *following* default, rights that are squarely governed by sections 1, 4.2(ii) and 4.2(iii) of the Security Agreement.

Defendant's construction is not unreasonable. Indeed, it is perhaps unavoidable if the Partnership Agreement and Security Agreement are to be read and construed together,[10] and if this Court endeavors (as, under New York law, it should) to favor an interpretation of the relevant agreements that gives meaning and effect to each provision. *See* 22 N.Y.Jur.2d, *Contracts* § 221 (1982).

Accordingly, having reviewed the relevant agreements, this Court concludes as follows: First, the Texas U.P.A. does not prohibit the assignment of a partnership interest that includes the assignment of management rights, unless such assignment is opposed by the non-assigning partner(s), *see* Tex.Rev.Civ.Stat.Ann. art. 6132b § 27(1) (Vernon 1970). Second, upon the SLT Trust's default on its obligation on the Non-Recourse Promissory Note, Newcomb (or its successors in interest) was entitled, as the secured party, to take possession of the collateral (plaintiff's partnership interest), *see* SLT-Newcomb Security Agreement § 4.2(ii), and then to participate directly in "the management, administration, affairs and control" of the Bank Partnership. *Id.* § 1.[11] Indeed, in order for the

---

**10.** It is well-settled that when different instruments are executed at the same time for the same purpose and in the course of the same transaction, all of the instruments must be read and construed together. *See Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941); *Cowden v. Broderick & Calvert, Inc.*, 131 Tex. 434, 114 S.W.2d 1166, 1170 (1938). Thus, it is clearly appropriate, in resolving the present contractual imbroglio, to read and con-

strue the Partnership Agreement and the Security Agreement together.

**11.** It is absolutely undisputed in this lawsuit that, on November 4, 1983, plaintiff undertook an obligation to pay Newcomb $750,000 plus interest on a Non-Recourse Promissory Note payable to Newcomb on November 7, 1985. It is likewise undisputed that plaintiff defaulted on that obligation. What is in dispute, of course, is the effect of such default under the Security

assumption of management rights to have any meaning, Newcomb and its successors in interest must now be entitled to exercise such rights in the place of the SLT Trust. Third, the Court finds that this transfer of management rights is not prohibited by the Partnership Agreement.

Given these conclusions, it is clear that plaintiff is simply not entitled to the declaratory or injunctive relief it seeks. This Court will not prohibit the Price Trust II from protecting the collateral that it now possesses under the SLT-Newcomb Security Agreement by exercising management rights in the Church & Thomas Bank. If that means that Thomas will be ousted from his management position at the Bank, then that must be seen as the consequence of plaintiff's deliberate decision to default on an obligation of over $900,000.[12]

### C. *Other Considerations*

By Order dated February 19, 1986, the Court instructed the parties in this case to submit supplementary memoranda on plaintiff's application for declaratory and injunctive relief. In part, that Order asked the parties to address the potential impact of the Court's resolution of the "manage-

ment rights" question upon the Bank Partnership itself.[13]

At the time that the Court requested supplementary memoranda, there was some concern expressed by plaintiff's counsel that the Court was reaching beyond the limits of the present dispute, which arises directly from the SLT-Newcomb Security Agreement and involves construction of the Partnership Agreement only to the extent that the former document incorporates provisions of the latter.[14] *See Hearing Transcript February 18–20, 1986* at 209–210.

As plaintiff has noted, the forum-selection clause in the Partnership Agreement requires that all claims and disputes arising directly out of that agreement "shall be brought, heard and resolved solely and exclusively by and in a Federal or State court situated in Galveston County, Texas." Partnership Agreement § 25.[15] Although defendants are willing to waive the Partnership Agreement's forum-selection clause, *see Hearing Transcript February 18–20, 1986* at 208, plaintiff is not, *see id.* at 209–210.

■ Plaintiff is entitled to enforce the Partnership Agreement's forum-selection clause, absent a showing that enforcement

Agreement. In construing the effect of such a default, the Court is mindful of the hornbook principle that "[c]ontracts are generally to be construed in favor of the promisee and against the promisor." 22 N.Y.Jur.2d § 227 at 75 (1982).

**12.** It does not appear that plaintiff is still asking this Court to enjoin defendants from selling, transferring or otherwise assigning the SLT Trust Promissory Note. *See supra* at note 6 (description of relief now sought by plaintiff). In any event, the Court will not order such relief, just as it will not enjoin the Price Trust II from disposing of its collateral (the SLT Trust's Partnership interest). The right of the Price Trust II to sell its collateral arises not only from section 4.2(iii) of the SLT-Newcomb Security Agreement, but also under the Uniform Commercial Code. A secured party that has taken possession of collateral after default ordinarily has the right to dispose of the collateral in a commercially reasonable manner. *See* UCC § 9–504. Indeed, there are circumstances under which a secured party is required to dispose of the collateral after default. *See* UCC § 9–505(2).

Plaintiff's central concern in this case is the *nature* of the collateral of which the Price Trust II would dispose. Had this Court ruled today that the purchaser of the SLT Trust's interest in the Bank Partnership had no right to participate in the Bank's management, plaintiff clearly would not have questioned the right of the current owner of that interest to sell or otherwise assign it.

**13.** For example, the parties were asked to address the following question: "Under the Texas U.P.A., will dissolution of the Bank Partnership result if the Court denies plaintiff's application for injunctive relief? Under the Texas U.P.A., will dissolution result if the Court grants plaintiff's application?"

**14.** See note 7, *supra*.

**15.** In contrast, section 7 of the SLT-Newcomb Security Agreement states that all disputes between the debtor and the secured party arising out of the Security Agreement "must be instituted in a State or Federal Court in the County and State of New York."

would be unreasonable and unjust, or that the clause is invalid by reasons such as fraud or over-reaching. *See AVC Nederland B.V. v. Atrium Investment Partnership,* 740 F.2d 148, 156 (2d Cir.1984) (citing *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972)). In this case, defendants have made no such showing and the Court certainly will not undertake to make it for them.

As a result, the scope of the present decision by this Court is necessarily quite limited. Although it is now clear that the Price Trust II (or subsequent purchasers of the SLT Non-Recourse Note) may participate in Bank management, many questions still remain unresolved. For example, it is unclear whether the SLT Trust, having now assigned both its interest in profits and surplus *and* its management rights to the Price Trust II, remains a "partner" in the Bank under the Texas U.P.A. and the Partnership Agreement. Accordingly, it is unclear whether plaintiff can continue to be held liable to third parties (such as the Bank's depositors) for actions taken by the Bank. *See Hearing Transcript February 18–20, 1986* at 15. Another matter of uncertainty is whether the SLT Trust's assignment of management rights to the Price Trust II forces a dissolution of the Bank partnership under the Texas U.P.A.

All of these issues arise directly out of the Partnership Agreement, and the parties must seek their resolution in the Texas courts.[16]

16. Plaintiff's last-hour revision of its application for injunctive relief, *see supra* note 6, is less than a paragon of clarity. As the Court understands plaintiff's modified application, it now seeks (in part) a declaration that the Price Trust II be enjoined from selling "specific property of the partnership." *See* Plaintiff's Memorandum of Law (February 26, 1986) at 3. It is unclear how the Price Trust II could sell partnership property, except by participating in a decision by the Bank management to sell such property. If plaintiff is arguing that, notwithstanding the SLT Trust's assignment of its partnership interest to Newcomb under the Security Agreement, the Trust retains rights in specific partnership property, *see* Tex.Rev.Civ.Stat.Ann. art. 6132b § 24(1) (Vernon 1970), then plaintiff is raising

### III. CONCLUSION

For the reasons stated herein, plaintiff's application for declaratory and injunctive relief is denied in its entirety. Pursuant to Fed.R.Civ.P. 65(a)(2), this case has now been tried on the merits, and plaintiff's action is dismissed.

SO ORDERED.

an entirely new issue as to which the Security Agreement is largely silent. It is this Court's view that any claim by plaintiff that the SLT Trust retains property rights in specific property of the Bank Partnership is a claim arising out of the Partnership Agreement. Accordingly, under section 25 of that Agreement, plaintiff's "specific property" claim should be litigated in the Texas courts.

Thus, although this Court declines to grant plaintiff's application to enjoin defendants from selling specific partnership property, it makes *no* decision regarding plaintiff's implied assertion that the SLT Trust continues to retain property rights in specific property of the Bank Partnership.